IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____
)
IN RE GUANTANAMO BAY                )        No. 13-____.
DETAINEE LITIGATION                 )
_____)
)
SAEED MOHAMMED SALEH HATIM,         )
et al.,                             )
                    Petitioners,    )
        v.                          )        Civil No. 1:05-cv-1429 (RCL)
BARACK H. OBAMA, et al.,            )
                    Respondents.    )
_____)
)
FADHEL HUSSEIN SALEH HENTIF,        )
et al.,                             )
                    Petitioners,    )
        v.                          )        Civil No. 1:06-cv-1766 (UNA)
BARACK H. OBAMA, et al.,            )
                    Respondents.    )
_____)
)
ABDURRAHMAN ABDALLAH ALI            )
MAHMOUD AL SHUBATI, et al.,         )
                    Petitioners,    )
        v.                          )        Civil No. 1:07-cv-2338 (UNA)
BARACK H. OBAMA, et al.,            )
                    Respondents.    )
_____)


**EMERGENCY MOTION FOR TEMPORARY ADMINISTRATIVE STAY, PENDING THE
FILING OF A FULL MOTION FOR STAY PENDING APPEAL**

STUART F. DELERY
  *Acting Assistant Attorney General*

RONALD C. MACHEN
  *United States Attorney*

MATTHEW M. COLLETTE
  (202) 514-4214
EDWARD HIMMELFARB
  (202) 514-3547
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7646*
  *Department of Justice*
  *950 Pennsylvania Ave., NW*
  *Washington, D.C.  2053*

## INTRODUCTION AND SUMMARY

Respondents-Appellants Barack H. Obama, et al., respectfully seek an emergency administrative stay, until 4 p.m. on Tuesday, July 23, 2013, of an order of the district court (Lamberth, J.) entered July 11, 2013, enjoining the Department of Defense from employing certain security procedures, which include a full body frisk and the use of centralized meeting facilities, when those procedures are applied to visits and telephone calls between Guantanamo detainees and their counsel. *See* Exh. A (order); Exh. B (Memorandum Opinion). The injunction appears to preclude the use of these security procedures for numerous calls and visits in the coming days, and one detainee has sought to enforce the court's order to facilitate a call scheduled for 2:00 p.m. today.  Accordingly, we respectfully request that the court issue an administrative stay no later than 1:00 p.m.

Notwithstanding a clear directive from Congress that courts do not have jurisdiction to entertain detainees' claims regarding conditions of confinement, *see* 28 U.S.C. § 2241(e)(2); *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 319 (D.C. Cir. 2012) (no jurisdiction over "an action other than habeas corpus"), the district court held that judicial review of detainees' habeas actions permits the court to substitute its own security procedures governing detainees' meetings with counsel, including how those detainees will be searched, where the meetings will be conducted, and which vehicles the military must use to transport detainees.  For the first time to the Government's knowledge, a federal court has restricted a military commander from implementing

routine security procedures at a detention facility holding enemy forces, notwithstanding the universally recognized need for the maintenance of discipline and order in those facilities.

The full-frisk search procedure used by Joint Task Force-Guantanamo ("JTF-GTMO") is the standard procedure used at all Army facilities, and similar or more invasive procedures are used for pretrial detainees held in civilian facilities in the United States. *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 558-559 (1979) (Court approving the use of body cavity searches of pretrial detainees after any contact meeting, including meetings with their attorneys); see also *Goff v. Nix*, 803 F.2d 358, 368-369 (8th Cir. 1986) (same for convicted prisoners). The district court nevertheless declared that the procedures are invalid when used for detainee meetings and telephone calls with their counsel, and suggested that those procedures were merely pretexts designed to deny detainees the right to meet with counsel. The court reached this result by disregarding the compelling security concerns articulated by military officials, including the discovery of weapons and other contraband and the suicide of a detainee who apparently had hoarded medication.

An administrative stay clearly is warranted here. While the district court has jurisdiction over detainees' habeas actions, it lacks jurisdiction to substitute its judgment for that of military officials with respect to security procedures at a military base. The fact that these security procedures are used to facilitate meetings with counsel provides no basis for asserting jurisdiction over internal security procedures.

2

And even if the court had jurisdiction, its decision to reject the uncontroverted sworn declarations of a senior commanding military officer on the basis of unfounded accusations of an improper motive is erroneous. The balance of harms also clearly favors a stay. The government has articulated significant security concerns that justify the procedures enjoined by the court. Moreover, the short administrative stay requested here will not harm petitioners. The Government continues to facilitate attorney telephone calls and visits with the detainees on an almost daily basis. To the extent any individual detainee declines to participate in a meeting or call under current security procedures, a short postponement during the duration of the administrative stay will not result in harm.

The United States has a strong interest in ensuring the detainees at the Guantanamo Bay detention facility have meaningful access to counsel to pursue their habeas rights. See Exh. C, Decl. of General John F. Kelly, U.S.M.C. ¶¶ 11-14. Indeed, from January through May of this year, over 193 attorney visits were scheduled. Kelly Decl. ¶ 12. And from March through May of this year, approximately 100 calls between detainees and their habeas counsel have occurred, almost as many that occurred in all of 2012. *Id.* However, because compliance with the district court's order would have severe consequences for the safe operation of the Guantanamo Bay detention facility, a stay is warranted to afford the Solicitor General an opportunity to consider authorizing an appeal, and to allow the Department of Justice to prepare full stay papers for this Court's consideration.

## STATEMENT

1.  Petitioners are detainees at the military detention facility at Guantanamo Bay.  Several of the petitioners have petitions for writs of habeas corpus pending in the district court or on appeal to this Court.  Under a district court protective order issued by Judge Hogan on September 11, 2008, detainees and their habeas counsel are permitted to meet in person and, at the discretion of JTF-GTMO officials, converse by telephone, subject to appropriate security procedures.

Detainees such as Petitioners are housed in either Camp 5 or Camp 6, separate but adjacent housing facilities operated by JTF-GTMO.  Detainee visits with counsel and telephone calls with family members occur at Camp Echo, which requires a brief van ride for transportation.  Slip op. at 4-5.  Due to telecommunication requirements, detainee telephone calls with counsel occur at Camp Delta, again, a brief van ride away.  *Id.*

2.  Under standard procedure, detainees are searched whenever they are moved to a facility external to their housing camp or they meet with any non-JTF-GTMO personnel.  Searches are conducted twice, once before leaving the camp or attending the meeting, and once upon returning to the camp or after the meeting.

a.  *Searches.*  Until recently, search policy did not permit guards to search the area from a detainee's waist to his mid-thigh unless authorized by the JDG Commander. Slip op. at 6.  On May 3, 2013, however, JTF-GTMO leadership revised the search procedure for detainee movements to include frisking and wanding of this

4

area.  *Id.*  This new search procedure was motivated by three concerns.  First, after taking command of the Joint Detention Group, Col. Bogdan became concerned that the search procedure then in use (the "modified search procedure") might be ineffective in identifying weapons and contraband.  Kelly Decl. ¶ 9.  Accordingly, Col. Bogdan decided to use the standard Army-wide search for which the guard force had been trained.  *Id.*  Second, the September 2012 suicide of detainee Adnan Farhan Abd Latif (ISN 156), who overdosed on medication that he had hoarded over a period of days, prompted a command investigation.  The resulting report, released in November 2012, recommended that Col. Bogdan reconsider the then-existing search procedures, which were deemed possibly ineffective to detect hoarded medications.  *Id.* ¶¶ 7-8.  After carefully considering the investigation report, JTF-GTMO leadership determined that safety and security required more thorough search protocols, but also decided to gradually phase the new procedures in to minimize camp disruption.  *Id.* ¶ 9.  Third, when Camp 6 was converted to single-cell housing in April 2013, it was discovered that detainees had potentially dangerous contraband, such as shanks (which could be turned into weapons), and prohibited electronic items.  *Id.* ¶ 10.  This discovery convinced Col. Bogdan that he could no longer delay implementing the new search procedure.  *Id.*

JTF-Guantanamo instituted a new protocol that includes frisking the area between the detainee's waist and mid-thigh and hand-wanding the detainee's entire

body with a metal detector, a standard Army-wide procedure in which JTF-GTMO personnel have been trained, and which is used at other military detention facilities and prisons worldwide. Slip op. at 6. Under this standard procedure, a guard gathers and crushes the fabric of the detainee's pants pockets to check for any objects in the pockets. The guard will touch the fabric on the outside of the detainee's waistband and shake it vigorously to dislodge any contraband. Specifically with regard to the groin area, at no time is the detainee's groin exposed to the guard. The groin is searched by placing the guard's hand as a wedge between the scrotum and thigh, and using the flat hand to press against the thigh to detect anything foreign attached to the body. A flat hand is used to ensure no contraband is hidden on the buttocks. Also as part of the search, a metal detector wand is also passed over, but not touched to, the waist-thigh area. *Id.* at 6-7.

      b.   *Location of Meetings*. Col. Bogdan assumed command of the Joint Detention Group in June 2012 and began a complete review of all policies and procedures for the operation of the detention facility. Based on his review, Col. Bogdan concluded that counsel meetings in Camp 6, one of the housing facilities for detainees, should no longer be permitted. His reasons for this conclusion, grounded in facility security, included (a) the need for counsel to be screened at Camp Echo, even if they were proceeding on to Camp 6; (b) Camp Echo's centralized room-monitoring facility, which frees guards for other duties during meetings other than standing watch outside the meeting room, and permits counsel to watch DVDs, read

books, and share food with their clients; (c) the fact that rooms at Camp Echo are larger and include a separate restroom facility in each meeting room as well as a space that can be used by the detainee for prayer (both absent in Camp 6); and (d) the fact that escorting counsel to and from Camp 6 from the visitor screening center at Camp Echo diverts guards and other personnel from other duties.

      c.    *Transportation.*  Detainees are transported from Camp 5 (another housing facility) or Camp 6 for legal calls and meetings external to their camp in full-sized vans.  JTF-GTMO introduced a number of new vans after completing a routine fleet upgrade and to address detainee complaints about a lack of air conditioning in the older vans.  Because the new models have air conditioning, they have larger air ducting, and correspondingly lower ceilings.  Detainees are not shackled to the floor of the van, but are seated and restrained.  The benches on which the detainees sit were initially made too high for the lower ceiling of the new vans, but if a detainee requires it, he may be transported in an older van that has higher ceilings.  Slip op. 7-8, 33-34.

      3.  The instant dispute stems from two motions.  Petitioners Abdurrahman Abdallah Ali Mahmoud al Shabiti and Fadhel Hueein Saleh Hentif filed an Emergency Motion to Enforce the Right of Access to Counsel.  Petitioner Saeed Mohammed Saleh Hatim filed an Emergency Motion Concerning Access to Counsel.  Both motions alleged that recently changed security procedures inhibited the right to counsel access, and sought an order permitting detainees to meet with counsel

without being subject to the new security protocol.  Petitioners also sought an order

permitting them to meet with counsel within their housing camps, and an order

precluding the transportation of detainees in new vans that petitioners contend force

them into painful stress positions.

On July 11, 2013, the district court issued an opinion and order granting the

motions in part.  Exh A, B.  The court first held that it was not deprived of

jurisdiction under 28 U.S.C. 2241(e)(2).  The court recognized that this provision

precludes challenges to a detainee's conditions of confinement, but held that the

instant challenge to the security procedures is "not a general challenge to petitioners'

treatment of conditions of confinement," but instead a "narrow challenge to alleged

government interference with petitioners' access to counsel that prevents them from

prosecuting habeas cases before this Court."  Exh. A, at 13.

On the merits, the court held that the security procedures implemented by JTF-

GTMO violate Petitioner's habeas rights.  The court began by declaring that the

deferential standard governing prison regulations articulated in *Turner* v. *Safley*, 482

U.S. 78 (1987), is logically inapplicable here, since this case involves the right to

pursue a petition for a writ of habeas corpus.  However, the court found no need to

define an alternate standard, concluding that the procedures fail under *Turner*.

With respect to detainee searches, the court held that the procedures were an

"exaggerated response" to the articulated need for security.  The court opined that

the earlier search procedures had been in effect previously at Guantanamo and did

not appear to be ineffective. Slip Op. at 20-22. The court held that the suicide of one detainee who had hoarded medication did not justify the new search procedures, reasoning that the government did not prove that the detainee had actually hid the medication in his groin area, and suggesting that the new policy could not be a legitimate response to the suicide because it was not fully implemented until six months later. *Id.* at 22-23.

The district court acknowledged that the discovery of weapons and other contraband in the possession of detainees would be reasonably related to an interest in security, but held that these concerns did not justify the new search procedure. The court based this holding upon the government's "previous actions at Guantanamo" unrelated to the search policy, which they court characterized as seeking to restrict detainee access to counsel "seemingly at every turn" (*id.* at 24). These actions, the court held, increase the likelihood that the search policy "is mere pretext" to deprive detainees of access to counsel. *Id.* at 25. The court then concluded that the government could not present detainee with "the choice between submitting to a search procedure that is religiously and culturally abhorrent or foregoing counsel effectively presents no choice for devout Muslims like petitioners." *Id.* at 25. The court further concluded that the search procedures "effectively leave petitioners without alternative avenues to exercise their right to habeas corpus.

With respect to the location of counsel visits and phone calls, the court conceded that the protective order allows JTF-Guantanamo to designate the room

9

but held that the use of Camp Delta and Camp Echo was unreasonable, and dismissed all of the justifications offered.  Slip op. at 28-31.  The court suggested that depriving detainees who are engaged in a hunger strike of visit rooms in the housing units was an attempt to deny counsel access "through alternative means."  *Id.* at 32.

Last, while recognizing that new vans were being used to provide better air conditioning, the court held that detainees must be given the option of being transported in the old vans to be able to sit up straight.

4.  The government moved for a temporary administrative stay of the order, which the district court denied.  In addition, another detainee (Hayal al-Mithali (ISN 840)), filed an emergency motion to enforce the Court's Order regarding the full-frisk-search policy, as applied to a call scheduled with his counsel for July 17, 2013, at 2:00 p.m..  The district court has not ruled on either motion.

## ARGUMENT

## AN ADMINISTRATIVE STAY SHOULD BE GRANTED.

A stay pending appeal should be granted if (1) the moving party has a substantial likelihood of success on the merits; (2) the moving party will suffer irreparable injury absent the stay; (3) the stay will not substantially injure the other parties interested in the proceeding; and (4) the public interest will be served by a stay. *Washington Metro. Area Transit Comm'n* v. *Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.

Cir. 1977). A stay is clearly warranted under this standard.[1]

# I. The Government Has A Substantial Likelihood Of Success On The Merits.

## A. The District Court Lacked Jurisdiction To Impose Its Own Set Of Security Procedures Governing Detainees At Guantanamo.

.

The government is likely to prevail on appeal because the district court was without jurisdiction to issue the injunction. Section 7 of the Military Commissions Act of 2006 provides that, with an exception not relevant here, "no court, justice, or judge shall have jurisdiction to hear or consider any other action [than an application for a writ of habeas corpus] against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination." 28 U.S.C. 2241(e)(2).[2] That provision unequivocally bars conditions-of-confinement claims by Guantanamo detainees, as numerous decisions by this Court have recognized. *See, e.g., Al-Zahrani* v. *Rodriguez*, 669 F.3d 315, 319

---

[1] The district court's order is appealable as an injunction, given this Court's "broad definition of an injunction as any order directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought by a complaint in more than preliminary fashion." *Salazar* v. *Dist. of Columbia*, 671 F.3d 1258, 1262 n.4 (D.C. Cir. 2012) (internal quotation marks omitted).

[2] This Court held in *Kiyemba* v. *Obama*, 561 F.3d 509, 512-13 (D.C. Cir. 2009), that the Supreme Court in *Boumediene* v. *Bush*, 553 U.S. 723 (2008), invalidated only section 2241(e)(1) and left section 2241(e)(2) in place.

(D.C. Cir. 2012).

The search and visit-location procedures plainly concern conditions of confinement. Indeed, those procedures are central to the security of the military detention facility, and apply to all detainee movement, whether or not it involves a meeting or call with counsel. Under the district court's rationale, section 2241(e)(2) can be easily evaded simply by recasting a conditions-of-confinement claim into a complaint about access to counsel. Permitting such artful pleading permits the court to go far beyond ensuring that detainees have the ability to pursue their habeas remedies, and allows the court to dictate the internal security procedures governing a military detention facility. There is no basis for this result.

### B. Even If The District Court Had Jurisdiction, There Was No Basis For Enjoining The Military From Applying Its Security Measures To Detainees, Or For Dictating The Locations Of Counsel Visits And The Means Of Transportation.

Assuming the court had jurisdiction, it still erred in enjoining the Department of Defense from using full-frisk security procedures, and in dictating not only where counsel visits have to take place but also the means of transportation of detainees to those locations. The Court has restricted the ability of JTF-GTMO to use a search procedure, otherwise standard in Army detention facilities, on detainees at a detention facility for enemy forces during an armed conflict. This result is contrary to both the universally recognized need for discipline and good order in such law-of-war

detention facilities[3] and to analogous precedent.  In the domestic criminal  context, for instance, courts have uniformly upheld physical body searches of prisoners and pre-trial detainees far more intrusive than the full-body frisk at issue here, despite the alleged discouraging effects that these searches had on attorney-client meetings. Resp'ts' Opp'n at 21-22; see Bell, 441 U.S. at 560 (rejecting Fourth Amendment challenge to visual-body-cavity searches on pretrial detainees after contact visits, despite alleged impact on the detainees' meetings with their attorneys); Goff, 803 F.2d at 366-370 (upholding visual-body-cavity searches of prison inmates after any contact visits, including visits with family, medical personnel, attorneys, and even the prison chaplain; and compiling cases).

The court made a fundamental error in applying *Turner* v. *Safley*, 482 U.S. 78 (1987).[4]  Instead of evaluating the policies on the basis of the proffered rationales, the court found that the policies were pretextual and were based on an improper motive. Motive is entirely irrelevant under *Turner*.  *Hammer* v. *Ashcroft*, 570 F.3d 798, 803 (7th

---

[3] See Jean S. Pictet, ed., Geneva Convention Relative to the Treatment of Prisoners of War: Commentary at 238 (Geneva: Int'l Comm. of the Red Cross, 1960).

[4] Despite expressing doubts, the district court assumed that *Turner* provided the appropriate standard.  The courts of appeals "have routinely applied Turner to jail regulations," and not just prison regulations.  *Jones* v. *Salt Lake County*, 503 F.3d 1147, 1155 n.7 (10th Cir. 2007) (citing, *inter alia*, *Mauro* v. *Arpaio*, 188 F.3d 1054, 1058 -59 (9th Cir. 1999) (*en banc*); *Barney* v. *Pulsipher*, 143 F.3d 1299, 1313 n. 17 (10th Cir. 1998); *Siddiqi* v. *Leak*, 880 F.2d 904, 908 -10 (7th Cir. 1989)).  *See also Hrdlicka* v. *Reniff*, 631 F.3d 1044, 1051 (9th Cir. 2011). *But see Shain* v. *Ellison*, 273 F.3d 56, 65 (2d Cir. 2001) (declining to apply *Turner* to jails).

13

Cir. 2009) (*en banc*) ("The Supreme Court did not search for 'pretext' in *Turner*; it asked instead whether a rule is rationally related to a legitimate goal. That's an objective inquiry."); *see Amatel* v. *Reno*, 156 F.3d 192, 199 (D.C. Cir. 1998), *cert. denied*, 527 U.S. 1035 (1999) ("standard is, if not identical, something very similar" to rational-basis review); *Waterman* v. *Farmer*, 183 F.3d 208, 215 (3d Cir. 1999) ("similar to rational-basis review").

The evidence before the court, including a declaration of the commander of the Guantanamo guard force, showed that the military had determined that security needs required the use of full-frisk search procedures. It showed that a cache of contraband (including materials that could be used as weapons) had been discovered in the detainees' living quarters. But the district court discounted this evidence, holding that the motivation for the security rules was a desire "to deny or to restrict Guantanamo detainees' access to counsel." Slip op. at 24. This approach flouts the requirements of *Turner* and fails to give the appropriate deference – due both because courts should defer to the military's assessment of its needs, *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) ("We 'give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.'") (quoting *Goldman* v. *Weinberger*, 475 U.S. 503, 507 (1986)); *In re Navy Chaplaincy*, 697 F.3d 1171, 1179 (D.C. Cir. 2012) ("the Supreme Court has instructed that, in assessing the balance of equities and the public interest, we must "'give great deference to the professional judgment of military authorities'" regarding

14

the harm that would result to military interests if an injunction were granted), and because the military is acting as the administrator of a detention facility. *Bell* v. *Wolfish*, 441 U.S. at 547 (corrections officials entitled to "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security").

Similarly, the district court had no basis for rejecting the decision of JTF-Guantanamo to hold counsel visits away from residential buildings based on an inference of an improper motive. And its order that detainees be permitted to request transportation in the older vans was based simply on a disagreement with the military's policy. It was without any legal basis.

## II.   The Government Will Suffer Irreparable Harm If The Order Is Not Stayed.

There will be irreparable injury if the Order is implemented or enforced immediately. As documented in the attached declaration of General John F. Kelly, U.S.M.C., Commander, United States Southern Command, who is the most senior military officer in the chain of command over JTF-GTMO, 10 U.S.C. 162(d), requiring JTF-GTMO to attempt to immediately comply with the Court's order regarding search procedures and attorney visit/phone call locations will reduce safety for both guards and detainees.

*Safety.* The principal danger posed by the district court's order is the increased risk that potentially dangerous contraband will be introduced into the camps. The

15

full-body frisk procedure recently instituted is necessary and appropriate for all moves outside a detainee's camp of residence and for all contacts with non-JTF-GTMO personnel. Sometimes during a detainee move (including moves for attorney visits, telephone calls, medical appointments, or ICRC visits), contraband items (such as tempered steel, wires, and nails) can be found on the ground where they can be picked up by or given to the detainee. Kelly Decl. ¶ 16. These contraband items, if obtained by a detainee, can be hidden on his person. *Id.* Concealment is made particularly easy if the detainee knows that his groin area cannot be thoroughly frisked. *Id.* These items can be used to attack and injure other detainees or the guards or to assist the detainee in committing suicide.

The modified search procedure described in the Order will not be sufficient to discover the smuggling of contraband – including improvised weapons – that are hidden in the groin area. "Grasping the waistband" and "shaking the leg" of a detainee's trousers will not reveal many dangerous contraband items, like nails, shanks, and ragged scraps of metal that are secreted in the groin area. Kelly Decl. ¶ 17. As a result, returning to the prior, modified search procedure reflected in the Court's Order, particularly when detainees will know that their groin areas will not be searched, will increase detainees' ability to hide contraband in their groin areas,[5] and

---

[5] The known inability of the guard force to search the detainees' groin area was cited in the Latif death investigation as a possible contributing factor to Mr. Latif's ability to hoard his medications for his subsequent suicide. Kelly Decl. ¶ 7.

correspondingly heighten the attendant risks to JTF-GTMO personnel, visitors, and detainees alike. *Id.*

A large stash of contraband was just recently uncovered, in late June 2013. Kelly Decl. ¶ 18. Photographs of the contraband are attached as Exhibit A to General Kelly's declaration. Among the recently seized items were nails, shanks, and a 10-inch T-handled allen wrench. *Id.* As these photographs illustrate, undiscovered contraband presents an ongoing threat to guards, attorneys, ICRC personnel, and the detainees alike, every day. Prohibiting the search of the areas between detainees' waists and knees would virtually guarantee them a secure location in which to secret these sorts of items after movements outside the camps. *Id.*

*Detainee unrest.* If guards cannot search detainees' groin areas after movements outside the residential camps or meetings with non-JTF personnel, JTF-GTMO will have to conduct more frequent full-frisk searches of the entire population to ensure an acceptable level of prison safety. Kelly Decl. ¶ 21. This necessary step will likely result in strong resistance from the detainees, leading to disciplinary problems, and thereby jeopardize their return to communal living status. *Id.*[6]

---

[6] To date, because they have complied with camp rules, over 30 detainees in Camp 6 have been returned to communal living since the April transition to single-cell living. Kelly Decl. ¶ 21. Communal living is the desire of the overwhelming number of detainees. *Id.* It is also JTF-GTMO's goal, in the interest of improving the detainees' living conditions, and improving relations with the detainee population generally. *Id.* This objective cannot be achieved unless the safety and security of both the detainees and JTF personnel can be assured. *Id.*

*Impossibility.*  As a practical matter, JTF Guantanamo cannot immediately comply with the Order regarding attorney meetings in Camp 5.  Currently, there is only one room available that has any practical possibility of hosting attorney meetings.  Kelly Decl. ¶ 23.  It is very small, however, approximately 4 feet by 6 feet, and has no visual monitoring capability.  *Id.*  To permit the visual monitoring of meetings that is necessary for safety and security reasons, guards would have to be stationed outside the room with the door open and near enough to it to conduct proper monitoring and ensure an appropriate response time in case of an incident, thereby increasing the possibility that confidential conversations in the room could be overheard.  *Id.*  To repurpose the room appropriately for attorney visits will require significant time and resources, and it would be a difficult undertaking to obtain effective modifications considering the size of the room.  *Id.*  Moreover, its location within an operational area of the Camp would require changes to camp operations.  *Id.*

*Impact of meetings in residential buildings.*  Holding attorney visits in Camps 5 and 6 will require the use of multiple guards in each camp to visually monitor these visits as they occur.  Kelly Decl. ¶ 25.  This responsibility will add to the existing burdens on a guard force already fully utilized to meet the demands placed on JTF-GTMO by other operations, such as medical appointments, other legal visits or calls, military commission hearings, ICRC meetings, family calls, and ordinary camp operations (meals, recreation).  *Id.*  The effect of the Court's order will be either to add to an individual guard's already full plate of duties, unnecessarily stressing that guard, or

18

more likely, to require the reassignment of others within the guard force. *Id.* Any reassignment, of course, will have secondary "ripple" effects throughout JTF-GTMO. *Id.* The duties from which such personnel will be drawn will necessarily be assigned to other soldiers. *Id.* Any of these scenarios will place additional significant burdens on JTF-GTMO; burdens that would not exist if attorney meetings were held at Camp Echo, which already has a dedicated guard force for handling visits by attorneys and others. *Id.*

### III. Any Potential Harm To The Detainees Is Not Substantial.

The record shows that any harm to the detainees is insubstantial. From January 1 through May of this year, over 193 attorney visits were scheduled. Kelly Decl. ¶ 12. And from March through May of this year, approximately 100 calls between detainees and their habeas counsel occurred, almost as many that occurred in all of 2012. *Id.* The government stands willing to assist detainees to exercise their right to habeas corpus as is evidenced by the efforts of JTF-GTMO and the Department of Defense to date. It is not a substantial barrier to the exercise of that right for detainees, during the pendency of an appeal, to submit to a full-body frisk – a frisk no more intrusive than frisks and searches carried out daily throughout this country on arrestees, pretrial detainees, and prison inmates, including the religiously devout.

### IV. The Public Interest Supports a Stay Pending Appeal.

The public interest favors the government. As a general matter, when the

government is a party, the interests of the government and the public merge.  This overlap of interests has occurred here.  The public, like the government, is interested in maintaining the safety and security of the Guantanamo Bay detention facility.  And while the public – like the government – also has an interest in detainees pursuing their habeas rights, that interest includes a requirement that the exercise of habeas rights not compromise facility security or good order.  Accordingly, the public interest favors a stay.

## CONCLUSION

For the foregoing reasons, we request that this Court temporarily stay the district court's order of July 11, 2013, until Tuesday, July 23, at 4 p.m., to afford the Solicitor General an opportunity to consider authorizing an appeal, and to allow the Department of Justice to prepare full stay papers.

20

Respectfully submitted,

STUART F. DELERY
  *Acting Assistant Attorney General*

RONALD C. MACHEN
  *United States Attorney*

MATTHEW M. COLLETTE
  (202) 514-4214
EDWARD HIMMELFARB
  (202) 514-3547
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7646*
  *Department of Justice*
  *950 Pennsylvania Ave., NW*
  *Washington, D.C.  20530*

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2013, I electronically filed the foregoing with

the Clerk of the Court, and caused the following counsel to be served by mail and by

electronic mail:

Brent Nelson Rushforth
MCKOOL SMITH
1999 K Street, Nw Suite 600
Washington , DC 20006
 (202) 370-8304
Brushforth@daypitney.com

Mason C. Clutter
National Association of Criminal Defense Lawyers
1660 L Street, NW 12th Floor
Washington , DC 20036
 (202) 465-7658
Mclutter@nacdl.Org

Alan Arnold Pemberton
COVINGTON & BURLING
1201 Pennsylvania Avenue, Nw
Washington , DC 20004-2401
(202) 662-5642
Fax: 202-778-5642
Email:Apemberton@cov.Com

Brian E. Foster
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, Nw
Washington , DC 20004
(202) 662-5255
Fax: (202) 778-5255
Email:Bfoster@cov.Com

David H. Remes
1106 Noyes Drive
Silver Spring , MD 20910

(202) 669-6508
Email:Remesdh@gmail.Com

Schuyler William Livingston , Jr.
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W
Washington , DC 20004-2494
(202) 662-6000
Fax: (202) 778-5380
Email: Wlivingston@cov.com

Aaron M. Tidman
DEBEVOISE & PLIMPTON LLP
555 13th Street, Nw
Washington , DC 20004
(202) 383-8000
Fax: (202) 383-8118
Atidman@debevoise.com

Jennifer R. Cowan
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York , NY 10022
(212) 909-6000
Fax: (212) 909-6836
Email:Jrcowan@debevoise.com

John B. Missing
DEBEVOISE & PLIMPTON, LLP
555 13th Street, Nw Suite 1100 East
Washington , DC 20004
(202) 383-8000
Email:Jmissing@debevoise.com

Michael S. Rapkin
233 Wilshire Boulevard 7th Floor
Santa Monica , CA 90401-1220
(310) 319-5465
Fax: (310) 319-5355
Email:Msrapkin@gmail.com

Scott B. Rapkin
LAW OFFICES OF MICHAEL S. RAPKIN
233 Wilshire Boulevard Suite 700
Santa Monica , CA 90401
(310) 319-5465
Fax: (310) 319-5355
Email:Scottrapkin@rapkinesq.Com

Stephen M. Truitt
STEPHEN M. TRUITT, ESQ
600 14th Street, Nw Suite 500
Washington , DC 20005-2011
(202) 220-1452
Fax: (202) 220-1665
Email:Truittsm@gmail.Com

Rebecca Briggs
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York , NY 10019
(212) 506-5000
Fax: (212) 506-5151
Email:Rbriggs@orrick.Com

**s/Edward Himmelfarb**

EDWARD HIMMELFARB

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

————————————————————————
                                                    )
IN RE GUANTANAMO BAY DETAINEE    )    **Misc. No. 12-mc-398 (RCL)**
LITIGATION                                          )
————————————————————————    )
                                                    )
**SAEED MOHAMMED SALEH HATIM,**      )
*et al.*,                                             )
                             **Petitioners**   )
                v.                                  )    **Civil No. 05-cv-1429 (RCL)**
                                                    )
**BARACK H. OBAMA,** *et al.*                  )
                                                    )
                             **Respondents**  )
————————————————————————    )
                                                    )
**FADHEL HUSSEIN SALEH HENTIF,**       )
*et al.*,                                             )
                             **Petitioners**   )
                v.                                  )    **Civil No. 06-cv-1766 (RCL)**
                                                    )
**BARACK H. OBAMA,** *et al.*                  )
                                                    )
                             **Respondents**  )
————————————————————————    )
                                                    )
**ABDURRAHMAN ABDALLAH ALI**          )
**MAHMOUD AL SHUBATI,** *et al.*,             )
                             **Petitioners**   )
                v.                                  )    **Civil No. 07-cv-2338 (RCL)**
                                                    )
**BARACK H. OBAMA,** *et al.*                  )
                                                    )
                             **Respondents**  )
————————————————————————    )

## <u>ORDER</u>

Before the Court is an Emergency Motion [37] to Enforce the Right of Access to Counsel

filed by petitioners Abdurrahman Abdallah Ali Mahmoud al Shubati (ISN 224) and Fadhel

Hussein Saleh Hentif (ISN 259).  Also before the Court is an Emergency Motion [38]

Concerning Access to Counsel filed by petitioner Saeed Mohammed Saleh Hatim (ISN 255) on

his own behalf and on behalf of several other Guantanamo detainees.  Upon consideration of

petitioners' Motions [37 and 38], the government's Opposition [42], petitioners' replies [44 and

45], the arguments presented at this Court's open and sealed hearings held June 5, 2013, the

entire record herein, the applicable law, and for the reasons set forth in the Court's Memorandum

Opinion issued this date, it is hereby

 **ORDERED** that the Motions are GRANTED in part and DENIED in part; and it is

further

 **ORDERED** that the Protective Order issued by Judge Hogan on September 11, 2008,

shall be amended by adding the following as paragraph II.J.39:

 "Detainees shall be subject to search prior to and after any in-person meeting or phone

call with counsel.  The search procedure used by JTF-Guantanamo for all searches prior to or

after any in-person meetings or phone calls with counsel shall be the modified search procedure

identified by Admiral Walsh on page 25 of the Review of Department Compliance with

President's Executive Order on Detainee Conditions of Confinement.  Specifically, guards shall

be limited to grasping the waistband of the detainee's trousers and shaking the pants to dislodge

any contraband."

 It is further **ORDERED** that paragraph II.C.11.b[1] of the Protective Order issued by Judge

Hogan on September 11, 2008, shall be amended to read as follows:

 "By default, legal visits for any detainee (1) who is in a weakened physical state on

account of participation in a hunger strike or (2) who has any medical condition that makes travel

outside the housing camp difficult, shall take place in meeting rooms within the detainee's

housing camp.  The Court understands that one such meeting room is available in Camp 5 and

---

[1] In the published version of Judge Hogan's Protective Order, paragraph II.C.11 has two sub-paragraphs designated "a."  As this citation is to the second of those sub-paragraphs, the Court corrects the typographical error in its citation for purposes of clarity.

two are available in Camp 6.  Access to meetings in these rooms shall be apportioned fairly.  If

detainees request more legal visits on a given day than the meeting rooms in the housing camps

may accommodate, the additional legal visits shall take place in other rooms designated by JTF-

Guantanamo.  Legal visits for detainees who do not meet the requirements set forth in the first

sentence of this paragraph shall take place in a room designated by JTF-Guantanamo.  No more

than two attorneys (or one attorney and one assistant) plus one interpreter/translator shall visit

with a detainee at one time, unless approved in advance by the Commander, JTF-Guantanamo.

Such approval shall not be unreasonably withheld."

It is further **ORDERED** that paragraph II.J.37 of the Protective Order issued by Judge

Hogan on September 11, 2008, shall be amended to read as follows:

"Counsel will meet with detainees in conference facilities provided by GTMO in

accordance with paragraph II.C.11.b of this Protective Order.  These facilities are subject to

visual monitoring by closed circuit TV for safety and security reasons.  The only other method of

visual observation available is for the door to remain open with military police sitting outside the

door.  No oral communications between counsel and the detainees will be heard."

It is further **ORDERED** that, for any travel between the detainee's housing camp and

another part of the Guantanamo detention facility for any in-person meeting with or phone call

with counsel, JTF-Guantanamo shall, at the detainee's request, transport the detainee in a vehicle

that allows the detainee to sit upright.

**SO ORDERED.**

**Signed by Royce C. Lamberth, Chief Judge, on July 11, 2013.**

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
                                                        )
IN RE GUANTANAMO BAY DETAINEE        )        **Misc. No. 12-mc-398 (RCL)**
LITIGATION                                              )
———————————————————————        )
                                                        )
**SAEED MOHAMMED SALEH HATIM,**         )
*et al.*,                                                 )
                                  **Petitioners**   )
                  v.                                     )        **Civil No. 05-cv-1429 (RCL)**
                                                        )
**BARACK H. OBAMA,** *et al.*                    )
                                                        )
                                  **Respondents**  )
———————————————————————        )
                                                        )
**FADHEL HUSSEIN SALEH HENTIF,**         )
*et al.*,                                                 )
                                  **Petitioners**   )
                  v.                                     )        **Civil No. 06-cv-1766 (RCL)**
                                                        )
**BARACK H. OBAMA,** *et al.*                    )
                                                        )
                                  **Respondents**  )
———————————————————————        )
                                                        )
**ABDURRAHMAN ABDALLAH ALI**            )
**MAHMOUD AL SHUBATI,** *et al.*,             )
                                  **Petitioners**   )
                  v.                                     )        **Civil No. 07-cv-2338 (RCL)**
                                                        )
**BARACK H. OBAMA,** *et al.*                    )
                                                        )
                                  **Respondents**  )
———————————————————————        )

## MEMORANDUM OPINION

## I.    INTRODUCTION

    **O**n May 23, 2013, President Obama promised, concerning detainees held at Guantanamo

Bay, that "[w]here appropriate, we will bring terrorists to justice in our courts and our military

1

justice system.  And we will insist that judicial review be available for every detainee."  Remarks

by the President at the National Defense University (May 23, 2013) (transcript available at

http://www.whitehouse.gov/the-press-office/2013/05/23/remarks-president-national-defense-

university).  This matter concerns whether the President's insistence on judicial review may be

squared with the actions of his commanders in charge of the military prison at Guantanamo Bay.

Currently, it cannot.

Petitioners are detainees at Guantanamo Bay who are in the process of seeking habeas

corpus relief and whose access to counsel is governed by this Court's 2008 Protective Order.

Petitioners allege that the Joint Detention Group ("JDG"), the group responsible for detention

operations within Joint Task Force-Guantanamo ("JTF-GTMO"), has instituted new search and

procedures that impair petitioners' access to legal counsel.

The petitioners' unique circumstances render this case no ordinary challenge to prison

regulations:  At its heart, this case is about petitioners' ability to invoke the writ of habeas corpus

through access to the Court and access to counsel.

Upon consideration of petitioners' Motions [37 and 38], the government's Opposition

[42], petitioners' replies [44 and 45], the arguments presented at this Court's open and sealed

hearings held June 5, 2013, the entire record herein, the applicable law, and for the reasons set

forth below, the Court finds the JDG's new procedures invalid as they pertain to access to

counsel and will GRANT petitioners' motions in part and DENY petitioners' motions in part.

II.     **BACKGROUND**

A.     **Procedural Background**

Before the Court is an Emergency Motion [37] to Enforce the Right of Access to Counsel

filed by petitioners Abdurrahman Abdallah Ali Mahmoud al Shubati (ISN 224[1]) and Fadhel

Hussein Saleh Hentif (ISN 259).  Emergency Mot. to Enforce the Right of Access to Counsel 1,

May 22, 2013, ECF No. 37 ("Hentif & Al Shubati Mot.").    Also before the Court is an

Emergency Motion [38] Concerning Access to Counsel filed by petitioner Saeed Mohammed

Saleh Hatim (ISN 255) on his own behalf and on behalf of several other Guantanamo detainees.

Emergency Mot. Concerning Access to Counsel 1–2, May 22, 2013, ECF No. 38 ("Hatim

Mot.").  All the petitioners request that this Court order the government to discontinue the use of

certain procedures that petitioners allege inhibit their access to legal counsel.   Specifically,

petitioners request the Court to order (1) that they may meet with counsel in person or by phone

without being subject to the new search protocol instituted by the JDG, (2) that they may meet

with counsel in person or by phone within their housing camps, and (3) that the government may

not transport detainees within the detention facility for attorney meetings or phone calls using

new vans that petitioners contend force them into painful stress positions.

Petitioners are at different stages in their respective habeas cases before the Court. Al

Shubati originally filed a petition for a writ of habeas corpus on December 31, 2007.  *See* Pet.

For Writ of Habeas Corpus, *Al Shubati v. Obama*, No. 07-CV-2338 (UNA) (D.D.C. Dec. 31,

2007), ECF No. 1.   On March 11, 2013, this Court dismissed al Shubati's petition without

prejudice at petitioner's and the government's joint request.   *See* Stipulation and Order

Dismissing Pet., *Al Shubati v. Obama*, No. 07-CV-2338 (UNA) (D.D.C. Mar. 11, 2013), ECF

No. 261.  Hentif filed his petition for habeas corpus on October 16, 2006.  *See* Pet. For Writ of

Habeas Corpus, *Hentif v. Obama*, No. 06-CV-1766 (HKK) (D.D.C. Oct. 16, 2006), ECF No. 1.

The Court, Judge Henry Kennedy presiding, denied his petition on August 1, 2011.  *See* Mem.

---

[1] "ISN" is the acronym for "Internment Serial Number," and each detainee currently housed at Guantanamo Bay has been assigned an ISN.  *Bostan v. Obama*, 821 F. Supp. 2d 80, 82 n.1 (D.D.C. 2011) (citing *Al-Harbi v. Obama*, Civil Action No. 05–2479(HHK), 2010 WL 2398883, at *3 n.2 (D.D.C. May 13, 2010)).

Op., *Hentif v. Obama*, No. 06-CV-1766 (HKK) (D.D.C. Aug. 1, 2011), ECF No. 281.  Hentif's

appeal of the dismissal of his petition is currently before the D.C. Circuit.  *See* Notice of Appeal,

*Hentif v. Obama*, No. 06-CV-1766 (RCL) (D.D.C. Oct. 8, 2012), ECF No. 292.  Hatim filed his

petition for habeas corpus on July 20, 2005.  *See* Pet. For Writ of Habeas Corpus, *Hatim v.

Obama*, No. 05-CV-1429 (RCL) (D.D.C. Jul. 20, 2005), ECF No. 1.  The Court, Judge Ricardo

Urbina presiding, granted his petition for a writ of habeas corpus on December 15, 2009.  *See*

Order, *Hatim v. Obama*, No. 05-CV-1429 (RCL) (D.D.C. Dec. 15, 2009), ECF No. 334.  The

D.C. Circuit vacated Judge Urbina's order on February 15, 2011 and remanded the case for

further proceedings.  *Hatim v. Gates*, 632 F.3d 720, 721 (D.C. Cir. 2011) (per curiam).  Hatim's

case was subsequently reassigned due to Judge Urbina's retirement, and this Court entered a

scheduling order for Hatim's petition for habeas corpus after a classified hearing on May 3,

2013.  *See* Order, *Hatim v. Obama*, No. 05-CV-1429 (RCL) (D.D.C. Dec. 15, 2009), ECF No.

415.

### B.    Factual Background

Petitioners are housed within two separate "camps" within the Guantanamo detention

facility.  Resp't's Opp'n to Pet'rs' Emergency Mots. Concerning Access to Counsel 6, June 3,

2013, ECF No. 42 ("Opp'n").  These camps—known as Camps 5 and 6—are modeled after, and

comparable to, maximum security prisons in the United States.  Opp'n, Ex. 1, at ¶¶ 10, 14, June

3, 2013, ECF No. 42 ("Bogdan Decl.").  Previously, meetings between petitioners and habeas

counsel took place in Camps 5 and 6, Hatim Mot. Ex. A, at ¶ 5, May 22, 2013, ECF No. 38-1,

though the government contends that attorney–client meetings have not taken place in Camps 5

and 6 for some time.  Bogdan Decl. ¶¶ 9, 13.

Currently, to meet with counsel or speak with counsel by phone, petitioners must travel

from their housing camp to other buildings—known as Camps Delta and Echo—located nearby within the Guantanamo detention facility.  *Id.* ¶ 22.  Petitioners are transported to Camp Delta for all phone calls with counsel and to Camp Echo for all in-person meetings with counsel.  *Id.* ¶¶ 5, 8.  Camps Delta and Echo contain dedicated facilities for conducting detainee phone calls and meetings.  For example, Camp Echo has specialized facilities to screen visitors, including attorneys, for contraband before they meet with detainees.  *Id.* ¶ 6.  Moreover, Camp Echo has a centralized facility from which guards may visually monitor attorney–client meetings remotely, meaning guards need not sit outside the meeting room for the duration of the detainee's meeting with counsel.  *Id.*  Similarly, Camp Delta has facilities "specifically designed and equipped for telecom operations."  *Id.* ¶ 8.

Camps 5 and 6, by contrast, lack dedicated facilities for phone calls.  *Id.* ¶¶ 8–9.  With respect to attorney–client meetings, Camp 6 at present has only two small rooms to accommodate such meetings, though Col. Bogdan, commander of the JDG, directed in September 2012 that those rooms would no longer be used for meetings between detainees and any non-JTF-GTMO personnel.  *Id.* ¶¶ 13–16.  In his sworn declaration, Col. Bogdan stated that Camp 5 has no rooms for attorney–client meetings.  *Id.* ¶ 11.  Nevertheless, according to a review of the Guantanamo detention facility prepared by Adm. Walsh in 2009, Camp 5 had "a climate controlled meeting room for legal representation."  Review of Department Compliance with President's Executive Order on Detainee Conditions of Confinement 11 ("Walsh Report").  It is unclear whether Col. Bogdan has since restricted the use of this room, as in Camp 6, or whether JTF-GTMO has repurposed the room, though what purpose could be greater than counsel access this Court cannot say.  For security reasons, attorneys cannot meet with detainees on the cell blocks or within detainee cells in the housing camps.  *See* Bogdan Decl. ¶ 11.  As a

result, detainees must leave their cells and travel to Camps Delta and Echo for phone calls and attorney–client meetings.

The process of transporting detainees from their housing camps to Camps Delta and Echo requires that they be searched and then transported by van to the relevant camp.  *Id.* ¶¶ 17–22. Previously, the search protocol in effect for detainees at GTMO did not allow guards to frisk the area between a detainee's waist and mid-thigh except with authorization from the JDG Commander.  *Id.* ¶ 17; Walsh Report 25.  Instead, guards used a modified search procedure whereby a guard would grasp the waistband of a detainee's trousers and shake the detainee's pants in order to dislodge any contraband.  Bogdan Decl. ¶ 17; Walsh Report 25.  The purpose of this modified search procedure was "to avoid actions that could be construed as disrespectful" of detainees' religious or cultural sensitivities.  Walsh Report 26.  The use of the modified procedures represented a considered policy judgment on the part of the former JDG commanders:  The commanders recognized that the modified search procedures "carrie[d] a level of risk," but they "accepted that risk out of an elevated respect for the religious concerns of the detainees."  *Id.*

On June 7, 2012, command of the JDG passed to Col. John V. Bogdan.  Bogdan Decl. ¶ 1.  On May 3, 2013, JDG revised its search procedures for detainees to comport with the standard army search procedure.  *Id.* ¶ 18.  This standard procedure includes frisking and wanding of the detainee's groin area.  *Id.* ¶ 20.  As before, the search involves the guard grasping the detainee's waistband and shaking it vigorously to dislodge contraband.  *Id.*  The new search protocol, however, adds several additional elements:  First, the guard gathers and crushes the fabric of the detainee's pants pockets to detect any objects in the pockets.  *Id.*  Second, the guard will search the detainee's groin area "by placing the guard's hand as a wedge between the

[detainee's] scrotum and thigh . . . and using [a] flat hand to press against the groin to detect anything foreign attached to the body." *Id.* Third, the guard uses a flat hand to frisk the detainee's buttocks to ensure no contraband is hidden there. *Id.* Fourth, "a hand-held 'wand' metal detector . . . is passed over the [detainee's] body." *Id.* ¶ 21. The wand search includes the detainee's groin and buttocks area, and guards hold the wand about one to two inches from the detainee's body while conducting the wand search. *Id.*

Under the JDG's standard procedure, detainees are searched whenever (1) they are moved to a facility external to their housing camp or (2) they meet with any non-JTF-GTMO personnel. *Id.* ¶ 19. According to Col. Bogdan, all detainee searches are conducted twice—once before leaving the housing camp or before a meeting with non-JTF-GTMO personnel and a second time prior to returning to the housing camp or after the meeting. *Id.* However, during the sealed hearing held on June 5, 2013, counsel for petitioner Al-Mithali stated that detainees are actually searched four times—once prior to leaving their cells, once upon arriving at the external facility or meeting room, once prior to leaving the external facility or meeting room, and once more upon returning to their cells. Sealed Hr'g Tr. 39, June 5, 2013. The JDG's standard procedure requires searching detainees for all movements or meetings, including attorney meetings, phone calls with attorneys or family members, or medical appointments. Bogdan Decl. ¶ 19.

For phone calls or attorney–client meetings, detainees must travel outside of Camps 5 and 6 to Camps Delta and Echo. *Id.* ¶ 21. The JDG transports detainees from Camps 5 and 6 to Camps Delta and Echo by van. *Id.* While traveling in the vans, detainees are restrained following standard military procedure using a 5-point fabric seatbelt harness. *Id.* On April 1, 2013, the JDG introduced several new vans as part of a routine equipment upgrade and to

address detainee complaints about a lack of air conditioning in the vans.  *Id.*  The new vans

include larger air ducts to improve air conditioning, but lower ceilings.  *Id.*  Petitioners contend

that, as a result, the lower ceilings in the vans force detainees to sit in crouched and painful stress

positions for the duration of the van ride.  Hatim Mot. 3; Hatim Mot. Ex. A ¶¶ 29–34; Hatim

Mot. Ex. G ¶ 9.

### C.    Legal Background

In a litany of rulings, this Court and the Supreme Court have affirmed that the federal

courts are open to Guantanamo detainees who wish to prove that their indefinite detentions are

illegal.  In 2004, the Supreme Court rejected the government's argument that the federal courts

had no jurisdiction to hear detainee habeas petitions.  *Rasul v. Bush*, 542 U.S. 466, 484 (2004).

Congress then twice amended the federal habeas statute, 28 U.S.C. § 2241, in an effort to

overturn the Supreme Court's ruling.  First, Congress passed the Detainee Treatment Act of 2005

(DTA), Pub. L. No. 109-148, 119 Stat. 2680 (2005), but the Supreme Court held that the

provision of the DTA depriving courts of jurisdiction over detainee habeas petitions did not

apply to cases pending when the DTA was enacted.  *Hamdan v. Rumsfeld*, 548 U.S. 557, 575–78

(2006).  Second, Congress passed the Military Commissions Act of 2006 (MCA), Pub. L. No.

109-366, 120 Stat. 2600 (2006) (codified in part at 28 U.S.C. § 2241 & note), but the Supreme

Court declared that detainees "are entitled to the privilege of habeas corpus to challenge the

legality of their detention."  *Boumediene v. Bush*, 553 U.S. 723, 771 (2008).  The Supreme Court

further invalidated the provision of the MCA that stripped courts of jurisdiction to hear habeas

petitions from detainees.  *Id.* at 792.  This Court and the Supreme Court also held that

Guantanamo detainees have a concomitant right to the assistance of counsel.  *Hamdi v.*

*Rumsfeld*, 542 U.S. 507, 539 (2004); *Al Odah v. United States*, 346 F. Supp. 2d 1, 5 (D.D.C.

2004).

These rulings raised significant questions about counsels' access to detainees and classified information. This Court first began to address this problem in *Al Odah*, where Judge Kollar-Kotelly found that the Court had power "to fashion procedures by analogy to existing procedures, in aid of the Court's jurisdiction and in order to develop a factual record as necessary for the Court to make a decision on the merits of" detainee habeas claims. 346 F. Supp. 2d at 6; *see also Harris v. Nelson*, 394 U.S. 286, 298 (1969) ("[A] district court may, in an appropriate case, arrange for procedures which will allow development . . . of the facts relevant to disposition of a habeas corpus petition."). Using this power, she proposed a framework for detainee counsel access. *Al Odah*, 346 F. Supp. 2d at 13–15. The government subsequently moved for a protective order "to prevent the unauthorized disclosure or dissemination of classified national security information." *In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174, 175 (D.D.C. 2004). This Court designated Judge Joyce Hens Green to coordinate and manage all Guantanamo proceedings and rule on common procedural and substantive issues. All then-pending Guantanamo cases, except those being heard by Judge Richard J. Leon, were transferred to Judge Green. In November 2004, Judge Green issued an "Amended Protective Order and Procedures for Counsel Access to Detainees," which set guidelines and procedures for counsel access to detainees and to classified information. Judge Green's protective order was ultimately a boon for the Court, for the Government, and for detainees as it settled many issues that would have otherwise, no doubt, required a great deal of litigation.

Judge Green's protective order stood without objection for four years. In light of the *Boumediene* decision in 2008, the members of this Court again determined that a single judge should rule on common procedural issues to facilitate the expeditious resolution of Guantanamo

habeas cases.  *In re Guantanamo Bay Detainee Litig.*, Miscellaneous No. 08-442 (TFH), Order [1] at 1–2, July 2, 2012.  The Court designated Judge Thomas F. Hogan, like Judge Green, "to coordinate and manage proceedings in all cases involving petitioners presently detained at Guantanamo Bay, Cuba." *Id.*  All then-pending Guantanamo habeas cases, and all such cases thereafter filed, were transferred to Judge Hogan for case management and coordination.[2]  *Id.* Judge Hogan also determined that the Court should issue a new protective order.  After considering the parties' positions espoused both in written submissions and at a status conference, Judge Hogan issued a carefully crafted and thorough protective order that contained procedures for counsel access to detainees and to classified information.  *In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d 143 (D.D.C. 2008) ("Protective Order" or "P.O.").  Judge Hogan's protective order was substantially similar to the protective order issued by Judge Green.

This Court recently revisited Judge Hogan's protective order as it pertained to detainees without any pending habeas petition before the Court.  *In re Guantanamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d 8 (D.D.C. 2012).  At that time, the government argued "that the Protective Order cease[d] to control counsel-access in the absence of a pending or imminent habeas petition" and sought to enter into Memoranda of Understanding (MOUs) with detainees that would set the terms for counsel access.  *Id.* at 11.  The terms of the MOUs proposed by the government differed substantially from those of Judge Hogan's Protective Order and would have hampered both petitioners' access to counsel and counsels' access to classified information.  *Id.* at 13–14.  This Court rejected the government's argument and the proposed MOUs.  Instead, the Court held that Judge Hogan's protective order governed counsel-access issues for all petitioners, including those without any pending habeas action.  *Id.* at 28.

---

[2] The Order specifically excluded cases over which Judge Richard Leon presided as well as *Hamdan v. Bush*, 04-cv-1519.  Order at 2 n.1, *In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442 (TFH) (July 2, 2008), ECF No. 1.

### III.    STANDARD OF REVIEW

The foundation of the Supreme Court's habeas jurisprudence is that the Great Writ lies at the core of this nation's constitutional system and that it is the duty of the courts to remedy lawless executive detention.

> Executive imprisonment has been considered oppressive and lawless since John, at Runnymede, pledged that no free man should be imprisoned, dispossessed, outlawed, or exiled save by the judgment of his peers or by the law of the land. The judges of England developed the writ of habeas corpus largely to preserve these immunities from executive restraint.

*Rasul*, 542 U.S. at 474 (citing *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 218–219 (1953) (Jackson, J., dissenting)).   "The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom."  *Boumediene*, 553 U.S. at 739; *see also Harris*, 394 U.S. at 290–91 (noting that the Great Writ serves as the "fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action.").   Moreover, the separation of powers also points to the fundamental importance of the Great Writ.  *See Boumediene*, 553 U.S. at 742 (noting that the separation of powers "serves not only to make Government accountable but also to secure individual liberty" (citing *Loving v. United States*, 517 U.S. 748, 756 (1996))). Indeed, under our Constitution it is the Suspension Clause that "protects the rights of the detained by affirming the duty and authority of the Judiciary to call the jailer to account."  *Id.* at 745 (citing *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)).

The duty imposed by the Great Writ requires the Judiciary to ensure that access to the courts is "adequate, effective, and meaningful."  *Bounds v. Smith*, 430 U.S. 817, 822 (1977); s*ee also Harris*, 394 U.S. at 292.  Practically, this means "that the privilege of habeas corpus entitles the prisoner to *a meaningful opportunity to demonstrate* that he is being held pursuant to 'the

erroneous application or interpretation' of relevant law." *Boumediene*, 553 U.S. at 779 (quoting *INS v. St. Cyr*, 533 U.S. 289, 302 (2001)) (emphasis added).

In the context of Guantanamo Bay habeas litigation, "access to the Court means nothing without access to counsel." *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 22 (D.D.C. 2005).  They are inseparable concepts and must run together.

> To say that Petitioners' ability to investigate the circumstances surrounding their capture and detention is "seriously impaired" is an understatement. The circumstances of their confinement render their ability to investigate nonexistent. Furthermore, it is simply impossible to expect Petitioners to grapple with the complexities of a foreign legal system and present their claims to this Court without legal representation.  Petitioners face an obvious language barrier, have no access to a law library, and almost certainly lack a working knowledge of the American legal system.  Finally, this Court's ability to give Petitioners' claims the "careful consideration and plenary processing" which is their due would be stymied were Petitioners to proceed unrepresented by counsel.

*Al Odah*, 346 F. Supp. 2d at 9.

Cognizant of both its duty to enforce the Writ and the context of Guantanamo habeas litigation generally, the Court now turns to the petitioners' emergency motions for counsel access.

## IV.    JURISDICTION

The government contends that this Court lacks jurisdiction to address petitioners' emergency motions.  "Federal courts are courts of limited subject-matter jurisdiction.  A federal court created by Congress pursuant to Article III of the Constitution has the power to decide only those cases over which Congress grants jurisdiction." *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012) (citing *Micei Int'l v. Dep't of Commerce*, 613 F.3d 1147, 1151 (D.C. Cir. 2010)).

As amended by Section 7(a) of the Military Commissions Act of 2006, the federal habeas statute provides, in relevant part,

(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a *writ of habeas corpus* filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

(2) [N]o court, justice, or judge shall have jurisdiction to hear or consider *any other action* against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e)(1)–(2) (emphasis added).   However, the Supreme Court invalidated § 2241(e)(1) as an unconstitutional suspension of the writ, and thus this Court has jurisdiction over petitions for writs of habeas corpus.   *Boumediene v. Bush*, 553 U.S. 723, 792 (2008).   Nevertheless, § 2241(e)(2) remains a valid bar to this Court's jurisdiction.   *See Al-Zahrani*, 669 F.3d at 319 (upholding "the continuing applicability of the [§ 2241(e)(2)] bar to our jurisdiction over 'treatment' cases.").   Thus, were this case an "other action"—that is, an action other than a petition for habeas corpus—relating to the "treatment . . . or conditions of confinement" of the Guantanamo detainees, this Court would have to dismiss for lack of jurisdiction.

The instant litigation, however, is not a general challenge to petitioners' treatment or conditions of confinement.   Instead, it is a narrow challenge to alleged government interference to petitioners' access to counsel that prevents them from prosecuting habeas cases before this Court.   Petitioners' challenge falls squarely within the Court's jurisdiction.   The Supreme Court implicitly recognized that counsel access issues relating to habeas cases fall within the district court's jurisdiction over habeas petitions.   In *Boumediene*, the Supreme Court explained that it "ma[de] no attempt to anticipate all of the evidentiary and access-to-counsel issues that will arise during the course of the detainees' habeas corpus proceedings. . . .   These and . . . other remaining questions are within the expertise and competence of the District Court to address in the first instance."   553 U.S. at 796.   Logically, the Supreme Court would not refer counsel-

access issues to the expertise of the District Court if it lacked jurisdiction to consider the issues in the first place.

Indeed, all the cases the government cites where this Court or the D.C. Circuit has concluded it lacked jurisdiction under § 2241(e)(2) are inapposite.  The present controversy is neither a request for a mattress and a blanket, *see In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d 312 (D.D.C. 2008), nor a request for transfer to another facility, *see Tumani v. Obama*, 598 F. Supp. 2d 67 (D.D.C. 2009); *Al-Shurfa v. Obama*, No. 05-CV-431 (RJL), 2009 WL 1451500 (D.D.C. May 21, 2009); *Khadr v. Bush*, 587 F. Supp. 2d 225 (D.D.C. 2008); *Al-Ghizzawi v. Bush*, No. 05-CV-2378 (JDB), 2008 WL 948337 (D.D.C. Apr. 8, 2008), nor a request for medical records or changes to medical procedures, *see Al Adahi v. Obama*, 596 F. Supp. 2d 111 (D.D.C. 2009); *In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d at 313–14, nor a tort claim against federal officials, *Al-Zahrani*, 669 F.3d at 316–17.  This action focuses solely on what rules will govern counsel access for the Guantanamo detainees during their habeas cases and whether the government, in contravention of Judge Hogan's protective order and numerous other rulings, may interfere with detainees' access to counsel.  Of course, it may not.

The government also argues that petitioners lack standing because they have failed to show "actual harm" under *Lewis v. Casey*, 518 U.S. 343 (1996).   In *Casey*, the Supreme Court found that prisoners could not bring claims alleging interference with their access to the courts "by establishing that [the] prison's law library or legal assistance program is subpar in some theoretical sense."  *Casey*, 518 U.S. at 351.  Instead, the constitutional requirement for standing meant that prisoners could only bring claims alleging interference with their right of access to the courts where they could show actual injury.  *Id.* at 349–352.  The Court did find, however, that

an illiterate and non-English-speaking prisoner had established actual injury by showing that he had been unable to bring his claims.  *Id.* at 356.

The government's reliance on *Casey* is misplaced.  Quite contrary to the government's conclusory statement that petitioners have made no showing of actual harm, Opp'n 19, the record is replete with examples of "past or imminent official interference with individual [detainees'] presentation of claims to the courts."  *Casey*, 518 U.S. at 349.  For proof, one need only look to this Court's previous opinions concerning counsel access and the numerous government attempts to interfere with counsel access identified therein.  *See In re Guantanamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d at 24–26 (collecting cases).  Moreover, the petitioners' situation is most similar to that of the illiterate and non-English-speaking prisoners for whom the Supreme Court found there was actual injury in *Casey*.  With respect to detainees at Guantanamo, as this Court has oft repeated, "access to the Court means nothing without access to counsel."  *Al-Joudi*, 406 F. Supp. 2d at 22.  "Petitioners are from foreign countries, . . . do not speak English, and are in all likelihood totally unfamiliar with the United States legal system.  As such they have 'no alternative form of legal assistance available to them.'"  *Id.* (citing *Bounds v. Smith*, 430 U.S. 817, 823 (1977)).  Absent aid from counsel, petitioners will be unable to prosecute their habeas claims.  Thus, interference with petitioners' access to counsel impairs their access to the courts in a direct and concrete fashion and not "in some theoretical sense."  Petitioners have shown imminent harm and therefore have standing to bring their claims for counsel access.  Consequently, this court may exercise jurisdiction over those claims.

In concluding that it has jurisdiction over petitioners' motions, the Court notes that § 2241(e)(2) does remove the Court's jurisdiction over any action by Guantanamo detainees other than (1) a petition for habeas corpus or (2) any attendant issues that arise under that petition, such

as the counsel-access or evidentiary issues that the Supreme Court identified.  Thus, the court would lack jurisdiction to consider any claims by petitioners relating to, for example, their medical treatment or access to regular mail.  Of course, the Protective Order has always operated within the jurisdictional bounds set out by the Supreme Court in *Boumediene* and by § 2241(e)(2).  *See, e.g.*, P.O. at ¶¶ II.D.12–.13 (setting out in great detail the procedures to be used for processing detainee legal mail, but noting that any non-legal mail would be processed according to the military's standard operating procedures).

## V.   ANALYSIS

### A.   The *Turner v. Safley* Standard is Logically Inapplicable to this Case

The government contends that the new search procedures instituted by Col. Bogdan pass muster under the deferential standard for prison regulations identified by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987).  The government's reliance on the *Turner* standard is misplaced, however, as *Turner* is logically inapplicable to regulations impinging on a detainee's right to petition for a writ of habeas corpus.

The logical foundation of the *Turner* line of cases lies in striking a balance between a circumscribed constitutional right and the judgment of prison administrators.  The Supreme Court described this reasoning clearly in *Bell v. Wolfish*, 441 U.S. 520 (1979).  There, the Court laid out four "general principles [to] inform [its] evaluation of the constitutionality of the" prison regulations at issue.  *Id.* at 545.  First, the Court recognized "that convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement."  *Id.* (citing *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 129 (1977); *Meachum v. Fano*, 427 U.S. 215, 225 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 555–56 (1974); *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  Second, however, "[l]awful incarceration brings about the necessary

withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* at 545–46 (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)). Third, the Court noted that maintenance of security and internal order are penological "goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id.* at 546. Fourth, the Court acknowledged that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions." *Id.* at 547. Consequently, courts should accord "wide-ranging deference [to] the adoption and execution of policies and practices that" prison administrators judge necessary for preservation of order and security. *Id.* As the Court further explained, "judicial deference is accorded not merely because the administrator ordinarily will . . . have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Executive and Legislative Branches." *Id.* at 548 (citing *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)).

The logical progression of the Court's analysis in *Bell* is clear and simple: Prisoners retain basic constitutional rights, but those rights may be necessarily limited in the prison context. Further, the government, acting as prison administrator, may limit prisoners' constitutional rights to accomplish valid penological objectives. Finally, given the Executive and Legislative branches' particular roles and expertise in prison administration, the Judiciary should give deference to the Executive and Legislature in how they chose to circumscribe prisoners' rights to achieve legitimate penological ends. Most importantly for this case, the second principle that the Court identified acts as a logical predicate for the principles that follow: the Executive or Legislature may limit a prisoner's rights in order to accomplish valid penological objectives because those rights are limited or withdrawn in the prison context. Similarly, the

court defers to the Executive or Legislature because it has balanced the prisoner's limited rights against the valid penological interest according to its prerogatives and expertise. *Turner* adds to this analysis by formalizing the deference the Judiciary must show to the Executive and Legislature into a test, though the analysis and logic underlying the Court's decision remain the same. *See Turner*, 482 U.S. at 84–91.

This logical analysis, however, is inapplicable to the right of habeas corpus itself. The notion that habeas corpus, like the freedoms of association[3] or speech,[4] may necessarily be limited or withdrawn in the penological context is absurd: "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). The right of habeas corpus is neither limited nor withdrawn in the prison context— indeed it is most valuable as a right to one who is incarcerated. To restrict a detainee's access to habeas corpus solely by virtue of his detention would run counter to the writ's purpose and would eviscerate the writ.

Moreover, the particular circumstances of the petitioners in this case strengthen, rather than weaken, the power of the writ. As the Supreme Court recognized in *Boumediene*, "where[, as here,] a person is detained by executive order, rather than, say, after being tried and convicted in a court, the need for collateral review is most pressing. . . . In this context the need for habeas corpus is more urgent." 553 U.S. at 783; *see also Rasul*, 542 U.S. at 474 ("[A]t its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive

---

[3] *See, e.g.*, *Overton v. Bazzetta* 539 U.S. 126, 131 (2003) ("[F]reedom of association is among the rights least compatible with incarceration. . . . Some curtailment of that freedom must be expected in the prison context." (citing *Jones*, 433 U.S. at 125–26; *Hewitt v. Helms*, 459 U.S. 460 (1983)).
[4] *See, e.g.*, *Bell*, 441 U.S. at 550–51 (concluding that a prison rule against receipt of hardback books unless sent directly from publishers, book clubs, or book stores was reasonable and therefore did not violate inmates' First Amendment rights).

detention, and it is in that context that its protections have been strongest." (quoting *St. Cyr*, 533 U.S. at 301)).   Any effort by the Executive or Legislature to limit a detainee's right to seek habeas corpus, just as they might limit the detainee's freedoms of speech or association, would be antithetical to the purpose of the writ.   Indeed, the Constitution forbids suspension of the writ except in limited circumstances.    U.S. Const. art I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.").   This conflicts with the Court's logic in *Bell* and *Turner* because the right at issue is not limited in the prison context.

The Supreme Court's analysis in *Bell* and *Turner* cannot apply to petitioners.   Since the right to seek habeas relief is not limited or withdrawn in the prison context, neither may the Executive or the Legislature circumscribe the petitioners' right, s*ee id.*; *Boumediene*, 553 U.S. at 798, nor must the court defer to the Executive's or Legislature's attempt to do so.   Though the *Turner* test is inappropriate here, this Court need not define the contours of the proper test because the new procedures challenged by petitioners would fail even under *Turner*.

### B.    The New Search Procedures Fail Under the *Turner* Standard

As the Supreme Court has noted, "federal courts must take cognizance of the valid constitutional claims of prison inmates."   *Turner*, 482 U.S. at 84 (citing *Martinez*, 416 U.S. at 405).   "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."   *Id.*   For example, those detained at Guantanamo "may invoke the fundamental procedural protections of habeas corpus."   *Boumediene*, 553 U.S. at 798.   Because detainees retain certain constitutional rights like habeas, "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights."   *Martinez*, 416 U.S. at 405–06.

Nevertheless, the Court must recognize both the special expertise of the Executive and Legislature in prison administration and its own limited expertise in that area.  "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government."  *Turner*, 482 U.S. at 84–85.  The Supreme Court has also identified prison administration as "a task that has been committed to the responsibility of those branches."  *Id.* at 85.

In order to balance the competing considerations between prisoners' rights and prison administration, the Supreme Court formulated its test as follows: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  *Id.* at 89.  By contrast, a prison regulation is invalid if it represents an "exaggerated response" to legitimate penological concerns.  *Id.* at 87.  To aid its analysis, the Supreme Court identified "four factors [that] are relevant in deciding whether a prison regulation affecting a constitutional right that survives incarceration withstands constitutional challenge: whether the regulation has a 'valid, rational connection' to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are 'ready alternatives' to the regulation."  *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (quoting and citing *Turner*, 482 U.S. at 89–91).

Applying the first *Turner* factor, the Court finds that the new search procedures lack a "valid, rational connection" to the legitimate government interest—security—put forward to justify them.  As the government correctly asserts, "internal security of detention facilities is a legitimate government interest."  *Block v. Rutherford*, 468 U.S. 576, 586 (1984).  The

government argues that three justifications satisfy the "valid, rational connection" between the revised search procedures and the government's legitimate penological interest in security of the Guantanamo detention facility: First, the old, modified search, i.e. shaking the detainee's waistband, is contrary to the military's standard procedure and increased the risk of inconsistent searches and decreased the searches' effectiveness.  Second, detainee Adnan Farhan Abd Latif (ISN 156) was able to commit suicide while in detention, and a subsequent review recommended changing the search policy in response.  Third, the transition of Camp 6 from communal living to single cell housing revealed contraband, including homemade weapons, shanks, and prohibited electronic devices.  The Court will address each of these justifications in turn.

The first justification, that the modified search used previously was contrary to the military's standard procedure, fails.  According to Col. Bogdan, since soldiers are not generally trained in the modified procedure previously used by the JDG, that procedure created a risk that the searches would be performed inconsistently and would be ineffective.  Opp'n 11; Col. Bogdan Decl. ¶ 17.  This justification does not hold water.  The modified search procedure had been in use since "the early years of detention operations at Guantanamo," or approximately eight or nine years.  Walsh Report 25.  The government does not explain how, other than by bald assertion, soldiers would be unable to follow a search procedure that had been in place for years. Moreover, American soldiers are intelligent and capable and have proven themselves able to implement correctly different protocols in different situations.   Indeed, the soldiers at Guantanamo do so already: one standard protocol is used for regular detainee mail and mail to the International Committee of the Red Cross, while a second protocol is used for legal mail.  *Id.* at 36–37; *see also* Protective Order ¶¶ II.D.12–.13.  This Court's previous opinion on legal mail notwithstanding, the soldiers and commanders at Guantanamo have proven themselves capable

of navigating the differences between these two systems.    Contrary to Col. Bogdan's bureaucratic desire for uniformity, every procedure employed at Guantanamo need not follow the same standard protocol.    As petitioners correctly argue, there is no basis in the record to support the government's argument that guards performed the old, modified searches ineffectively or inconsistently.    Pet'rs' Reply 3–4, June 4, 2013, ECF No. 44 ("Hatim Reply").

The government's second justification for the new search procedures involves the suicide of detainee Adnan Farhan Abd Latif.    Latif committed suicide in September 2012 by overdosing on medication that he had hoarded over a short time period.    Opp'n 11.    The command investigation performed after Latif's suicide noted that he *may have* hidden the medications in his groin area.    *Id.*; Bogdan Decl. ¶ 18.    According to the government, this incident provides a further "valid, rational connection" to satisfy the first *Turner* factor.    At this Court's sealed hearing on June 5, Counsel for petitioners noted, however, that Col. Bogdan's affidavit nowhere states that Latif *actually* hid medications in his groin area, only that the prior search procedure provided him with the opportunity to do so.    Sealed Hr'g Tr. 7; *see also* Bogdan Decl. ¶ 18.    In response, government counsel only stated that Latif "might" have hoarded medication in his groin area.    Sealed Hr'g Tr. 20.

Petitioners correctly conclude that Latif's possible opportunity to hoard medication bears no logical connection to a policy to search the groin area of every detainee every time he is moved or meets with non-JTF personnel, whether that be medical personnel, representatives from the International Committee of the Red Cross, or legal counsel.    Hatim Reply 4.    The government's attempts to justify the new procedure on the basis of Latif's suicide have the patina of pretext to them.    The mere possibility that Latif hoarded medications in his groin area, with nothing more, will not support the new search policy because the logical connection between the

policy and this supposed justification "is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90.

Moreover, the government's actions in regards to the command investigation of Latif's suicide belie the suggestion that Latif's death was a justification for the new search policies. Latif's death occurred in September 2012, and the command investigation of his death released its report in November 2012. Bogdan Decl. ¶ 18. Col. Bogdan and the JDG, however, did not implement the new search procedures until May 3, 2013. *Id.* Though Col. Bogdan states that he "developed a phased approach in December 2012 to gradually" implement the new search procedure, his statement stands in contrast to his decision to institute the new search procedures almost immediately upon discovering contraband in the transition of Camp 6 from communal housing to single cell housing. *Id.* To the Court's view, Col. Bogdan's swiftness in implementing the new searches in May 2013 shows that linking the new searches to the death of Latif and the subsequent investigation was merely an afterthought.

The third justification the government offers for the new search policies under the first *Turner* factor is the discovery of contraband in Camp 6. According to Col. Bogdan's statement, in April 2013, the JDG transitioned Camp 6 from communal living for detainees to keeping detainees in individual cells. *Id.* In the course of the transition, the JDG discovered "a number of contraband items, including homemade weapons, such as shanks, and prohibited electronic devices." *Id.* The presence of contraband or weapons would represent a threat to camp security. On its face, this justification appears to offer the strongest logical relationship between the new search procedures and the government's legitimate interest in security at the Guantanamo detention facility. Indeed, this Court "understand[s] why [prison administrators] might need to do an overall search of the prison to be sure there are no shanks" or other improvised weapons.

Sealed Hrg. Tr. 22.  The Court has heard of similar generalized searches at domestic prisons.  *Id.* (citing the local jail in Washington, D.C. as an example).

When viewed in isolation, as the government has presented it, the presence of contraband makes the new search procedure appear reasonably related to the government's legitimate penological interest in security.  The Court, however, must view the new procedure and the proffered justification in light of the government's previous actions at Guantanamo.  As petitioners' counsel correctly noted during this Court's hearing, "[t]he government is a recidivist when it comes to denying counsel access."  Sealed Hrg. Tr. 11.  The government, seemingly at every turn, has acted to deny or to restrict Guantanamo detainee's access to counsel.  The government designated Guantanamo as a "detention facility" rather than as a "corrections facility" because, under the Navy's own regulations, those incarcerated at a corrections facility have unconditional access to their attorneys.  *See In re Guantanamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d at 17.  The government sought to require detainees without pending habeas petitions to sign memoranda of understanding that would have removed them from the ambit of the Court's Protective Order and only allowed access to counsel at the government's whim.  *See id.* at 13–14.  The government has severely curtailed the number of flights to Guantanamo.  *See* Order at 4, *Al-Zarnouqi v. Obama*, No. 06-CV-1767 (RCL) (D.D.C. May 6, 2013), ECF No. 415.  Predictably, given the limited number of commercial flights to Guantanamo, counsel must now wait in queue for at least two months before they may meet with their clients.  Open Hr'g Tr. 20–21, June 5, 2013; *see also* Hatim Reply Ex. K ¶¶ 11–12 (noting that the limited flight schedule—counsel may only fly in on Mondays and out on Fridays—increases costs since counsel and translators must travel to Guantanamo for a full week).  The government has, in some instances, withheld legal mail from petitioners without notifying the

Court or petitioners' counsel.  *See* Order at 4, *Al-Zarnouqi v. Obama*, No. 06-CV-1767 (RCL) (D.D.C. May 6, 2013), ECF No. 415.  And this is to say nothing of the multiple instances this Court has identified where the government sought to inhibit counsel access in individual cases. *See In re Guantanamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d at 24–26 (collecting cases).  The government's repeated actions substantially increase the likelihood that its justification is mere pretext and that the new searches represent an "exaggerated response" to its legitimate interest in security of the detention facility.  Thus, a thorough examination of the government's proffered justification is appropriate.

While the Court agrees that the presence of improvised weapons and contraband is logically related to the need for searches generally, the Court finds the new genital search procedure to be yet another exaggerated response by the JDG that is presently inhibiting petitioners' access to counsel.  Since implementation of the new search procedure, multiple petitioners have foregone, some for the first time, phone calls or meetings with counsel.  Hatim Mot. 4–5; Hatim Mot. Ex. A ¶¶ 13–18; Hatim Mot. Ex. B; Hatim Mot. Ex. C ¶¶ 7–10; Hatim Mot. Ex. D ¶¶ 7, 11–12; Hatim Mot. Ex. E ¶¶ 3–7; Hatim Mot. Ex. F ¶¶ 4–6; Hatim Reply 7–8; Hentif & Al Shubati Mot. Ex. A ¶¶ 4–6, 8.  This does not represent, as the government argues, "mere voluntary refusal" on each petitioner's part.  Opp'n 14.  Instead, the Court finds that the new search procedures actively discourage petitioners from taking phone calls or meeting with counsel.  As petitioners' counsel argued, the choice between submitting to a search procedure that is religiously and culturally abhorrent or foregoing counsel effectively presents no choice for devout Muslims like petitioners.  Open Hr'g Tr. 19; Sealed Hr'g Tr. 14–15; Hentif & Al Shubati Mot. Ex. A ¶¶ 8.  The relationship between the searches and petitioners' choices to refuse phone calls and counsel meetings is clear and predictable.  Indeed, petitioners also find searches of the

25

Quran abhorrent, and many petitioners have chosen to forego having a Quran in their cells rather than having their Qurans subject to search.  Hatim Mot. Ex. A ¶¶ 3, 22, 24–25; *see also* Charlie Savage, *Officials Describe Chaos at Guantanamo in Weeks Before Raid on Prison*, N.Y. Times (Apr. 16, 2013), http://www.nytimes.com/2013/04/17/us/politics/detainees-hit-guards-in-weekend-raid-officials-say.html (noting that detainees offered to end the current hunger strike by giving up their Qurans rather than have them be searched).

That this relationship is so clear and predictable makes it easy for the government to exploit.  Given that detainees are already shackled and under guard whenever they are moved, Hatim Mot. Ex. A ¶ 5, the added value of the new genital search procedure vis-à-vis the prior search procedure is reduced.  In this context, the court finds searching the genitals of petitioners up to four times for every phone call or attorney–client meeting—as petitioners have described, Hatim Mot. Ex. B ¶¶ 7–8, 15; Sealed Hr'g Tr. 39—to be excessive.  Searching detainees up to four times in this manner for every movement, meeting, or phone call belies any legitimate interest in security given the clear and predictable effects of the new searches.  Moreover, as petitioners note, nothing in the record indicates that detainees have received any contraband from their attorneys or that detainees have attempted to pass contraband to each other during phone calls or meetings with attorneys.  Hatim Reply 4–5.  The motivation for the searches is not to enhance security but to deter counsel access.  Thus, the Court finds the search procedure an "excessive response" under the first *Turner* factor.

Turning to the remaining factors identified in *Turner*, the second factor considers "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90.  Here, the government again argues that it is not inhibiting counsel access and that it is petitioners who have voluntarily chosen to forego phone calls or meetings with

counsel.  Opp'n 24.  As above, the Court rejects the government's argument.  As petitioners'

counsel noted, the predicable consequences of the government's actions are "the breaking [and]

severing of attorney–client communication except by letter which is by slow boat."  Open Hrg.

Tr. 19.  The Court recognizes that, as petitioners argue, it would be untenable to prepare a habeas

case for trial or appeal where counsel could only contact petitioners by legal mail.  Hentif & Al

Shubati Mot. 5.  Absent face-to-face meetings and telephone calls, petitioners' habeas cases will

not go forward.  Thus, the new search procedures effectively leave petitioners without alternative

avenues to exercise their right to habeas corpus.

The third *Turner* factor looks at "the impact [that] accommodation of the asserted

constitutional right will have on guards and other inmates, and on the allocation of prison

resources generally."  *Turner*, 482 U.S. at 90.  Here, the government contends that "[r]everting to

the old search policy . . . would mean restoration of the same security risks to detainees, guards,

and counsel, and the same operational disruptions and difficulties."  Opp'n 24.  But, as

petitioners correctly argue, the record presents no connection between the prior search

procedures and any such "disruptions or difficulties."  Indeed, the record does not show that

guards performed searches inconsistently, and the government can show only a possible

connection of the prior search procedures to the death of detainee Latif.  Further, given that

detainees are watched and shackled during transport, and that guards may search detainee's cells

or the detainees themselves at other times, the "ripple effect" of reverting to the prior search

procedure for attorney–client meetings should be minimal.

The fourth *Turner* factor looks to the "absence" or "existence" of "ready alternatives" to

the challenged regulation.  *Turner*, 482 U.S. at 90.  The Supreme Court explained that "the

absence of ready alternatives is evidence of the reasonableness of a prison regulation," but "the

existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* The petitioners easily satisfy this factor. As this court counseled in its previous counsel-access opinion, "if it ain't broke, don't fix it." *In re Guantanamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d at 16. Given its many years of use at the Guantanamo detention facility, the old modified search procedure represents an "obvious, easy," and proven alternative to the challenged new search procedure. The government's assertion that these searches may have led to Latif's suicide or the presence of contraband is purely speculative and does not diminish the fact that the prior procedure represents an easy alternative.

In summary, the Court finds the evidence submitted by petitioners and contained in the record sufficient to carry their burden to show that the new search procedure is an "exaggerated response" to the JDG's concerns. Further, the Court finds the government's proffered justifications for the new search procedure unpersuasive in light of the evidence in the record. Thus, the Court will order that the modified search procedure be used for in-person detainee meetings with counsel and for detainee phone calls with counsel.

## C.   The JDG Must Allow Certain Detainees to Meet with Counsel in the Housing Camps

The Court now turns to the petitioners' request that the Court order JTF-GTMO to allow detainees to meet with counsel in their housing camps. At the outset, the Court recognizes that under the current regime, the government has the prerogative to select the location for attorney–client meetings. Under the Protective Order, "[l]egal visits shall take place in a room designated by JTF-Guantanamo." ¶ II.C.11.b;[5] *see also* ¶ II.J.37 ("Counsel will meet with detainees in

---

[5] In the published version of Judge Hogan's Protective Order, paragraph II.C.11 has two sub-paragraphs designated "a." As this citation is to the second of those sub-paragraphs, the Court corrects the typographical error in its

conference facilities provided by GTMO.").   Of course, the government's control over the location for attorney–client meetings under the Protective Order is subject to revision.  *See id.* ¶ II.A.1 ("Except as otherwise stated in these Procedures . . . or by other Order issued in the United States District Court for the District of Columbia, the following procedures shall govern counsel access to all detainees [at GTMO].")  Though the Protective Order gives substantial deference to JTF-GTMO, as is appropriate, the overarching context of the protective order is one in which the government may exercise its prerogatives as prison administrator, but must do so reasonably. *See, e.g.*, *id.* ¶ II.C.11.a–.b (requiring that JTF-GTMO use reasonable efforts to accommodate counsel's requests for meetings with their clients and that the Commander, JTF-GTMO will not unreasonably withhold approval for more than two attorneys and one translator to meet with a detainee at one time).  This standard of reasonableness is appropriate as it is, arguably, what would be required under *Turner*.

Applying the first *Turner* factor, the government offers two justifications for the policy forbidding attorney–client meetings in the detainees' housing camps.  The government's first justification is, essentially, that the meeting rooms in Camp Echo are in some way better for the detainees and counsel than any room available in Camp 5 or 6.  *See* Opp'n 9 (noting that the Camp Echo meeting rooms have separate spaces for detainee prayer and that, at Camp Echo, counsel may "watch DVDs, read books, and share food with their clients").  While Col. Bogdan's desire to provide detainees with better accommodations for attorney–client meetings is admirable, it has nothing to do with the government's interests in security or camp operations. Moreover, it is undercut by the petitioners' assertion that the change inhibits counsel access.  The government's second set of justifications, however, is more substantial.

The government identifies several logistical concerns that it contends favor restricting

---

citation for purposes of clarity.

attorney–client meetings to Camp Echo.   First, the government notes that all visitors to
Guantanamo, including attorneys, must pass through visitor screening at Camp Echo regardless
of their destination within the detention facility.  *Id.*; Bogdan Decl. ¶ 6.  Second, the government
points to the need to divert guards and Staff Judge Advocates to escort counsel to and from
meetings in the housing camps.  Opp'n 9; Bogdan Decl. ¶ 15.  Third, the government contends
that meetings in the housing camps will impair movements of other detainees in the housing
camps as other detainees cannot be moved while a detainee is moving to or from a meeting in the
housing camp.  Opp'n 10; Bogdan Decl. ¶ 15.  Fourth, and most importantly, the government
argues that meetings in the housing camps divert guards from other tasks because the guards
must monitor the attorney–client meetings.  Opp'n 10; Bogdan Decl. ¶ 15.

        The government's first three justifications are easily dismissed.  As to the first, the fact
that all the attorneys must enter the detention facility via Camp Echo has no logical bearing on
whether detainees may meet with their attorneys in the housing camps or only at Camp Echo.
Indeed, habeas counsel have expressed no concern with whatever added inconvenience a trip
from Camp Echo to Camp 5 or 6 might represent.  Moreover, the government has raised no
concerns about movement of counsel within the facility.   As to the second justification,
petitioners' counsel correctly reason that the guards may escort the detainee to Camp Echo or
counsel to the housing camps, but in either case they must escort someone somewhere.  Hatim
Reply 5–6; *see also* Bogdan Decl. ¶ 7 ("JTF-GTMO maintains an escort staff of guards whose
exclusive mission is to support movements of detainees and visitors, including habeas counsel.").
Presumably, escorting the attorneys should be the easier of the two insofar as counsel need not
be shackled for the trip.  The government's third justification is likewise inadequate: if only one
detainee may be moved at a time, the problem of coordinating detainee movements will exist

regardless of whether detainees meet with their attorneys in Camp Echo or in the housing camps since detainees must move through their housing camps in either case.

The government's fourth justification, however, requires more careful consideration.  The government argues that allowing detainees to meet with their attorneys in Camp 5 or 6 would negatively impact the availability of the guard force.  Opp'n 10, 23.  Specifically, the lack of a centralized video-monitoring facility in Camps 5 or 6 of the sort that exists in Camp Echo means that guards must be stationed outside the meeting room "to ensure the safety of counsel and to discourage and prevent misconduct by the detainee."  Opp'n 10, 23; *see also* Bogdan Decl. ¶ 15.  Of course, stationing guards outside the room for attorney–client meetings diverts the guards from other duties and, the government contends, may interfere with camp operations.  Opp'n 10, 23; Bogdan Decl. ¶ 15.  The allocation of guard staff and their duties requires considerations of "planning . . . and the commitment of resources," *Turner*, 482 U.S. at 85, for which the Executive has expertise and to which the Judiciary typically defers.  The courts need not give blind deference, however.  Indeed, the Court must examine the regulation in its context to determine if there is a valid, rational connection to legitimate penological interests.

Examination of the context of detention at Guantanamo shows that the JDG's regulation forbidding attorney–client meetings in Camps 5 or 6 lacks a valid, rational connection to the government's legitimate penological interests in security or orderly administration.  To be sure, allowing attorney–client meetings in the housing camps will divert some guards away from their other duties, but the Court must recognize that the practical effect of petitioners' request is limited.  As Adm. Walsh identified, there is only one room for attorney–client meetings in Camp 5, Walsh Report 11, and Col. Bogdan identified two rooms that could be used for attorney–client meetings in Camp 6.  Bogdan Decl. ¶ 14.  Assuming that the JDG must station two, or even

three, guards outside the meeting rooms, allowing attorney–client meetings would divert a maximum of two to three guards in Camp 5 and four to six guards in Camp 6.  The Court is confident the JDG can spare these guards to accommodate the use of one attorney–client meeting room in Camp 5 and two attorney–client meeting rooms in Camp 6.  Moreover, the Court must remain cognizant of the fact that almost two-thirds of those detained at Guantanamo, including several of the petitioners, are engaged in a weeks-long hunger strike.  Hatim Mot. 3.  Those detainees engaged in the hunger strike are, expectedly, in a substantially weakened physical state.  *Id.*; *see also id.* Exs. A–G (describing the physical state of detainees engaged in the hunger strike).  In such a state, detainees are both (1) less able to move from their housing camps to Camp Echo or Camp Delta and (2) less of a security risk.  Indeed, in the context of the hunger strike, failure to accommodate petitioners' reasonable request seems less like a valid choice on the part of the JDG commander and more like an attempt to deny counsel access through alternative means.

The Court now turns to the remaining *Turner* factors.  Applying the second factor, the Court finds that, for those detainees participating in the hunger strike who are too weak to go to Camp Echo to meet with counsel, no alternatives to exercise their right to petition for habeas corpus exist.  As this Court stated above, any attempt to bring a habeas petition where attorney–client communications are limited to legal mail would be untenable.  Applying the third *Turner* factor, the Court finds that the "ripple effect" of accommodating the detainees' request would be minimal given the limited facilities available for attorney–client meetings at Camps 5 and 6.  Finally, under the last *Turner* factor, allowing limited attorney–client meetings in Camps 5 and 6 is an obvious and reasonable accommodation for those detainees too weakened by the hunger strike to travel to Camp Echo.

In summary, the Court finds the JDG's policy of forbidding attorney–client meetings in the housing camps to be an exaggerated response to the government's penological interests in security and orderly operations.  The Court will amend Judge Hogan's Protective Order to require that the JDG allow attorney–client meetings in Camps 5 and 6 for those detainees who are in a weakened physical state due to participation in the hunger strike or who have a medical condition that similarly makes travel outside the housing camps difficult.  Given the limited space available for attorney–client meetings in Camps 5 and 6, counsel for petitioners and government counsel shall meet to establish procedures to ensure that the limited availability for attorney–client meetings in the housing camps is apportioned fairly amongst the detainees.

### D.     The JDG Must Allow Certain Petitioners to Use the Old Vans for Transport to Camps Echo and Delta

Due to the limited space for attorney–client meetings at Camps 5 and 6, some detainees may still need to travel to Camps Echo and Delta for attorney–client meetings and phone calls.  Thus, the Court now turns to petitioners' challenge to the vans used by JDG to transport detainees from their housing camps to Camps Echo and Delta.  Applying the same considerations that it applied to the regulations concerning attorney–client meetings in the housing camps, the Court concludes under *Turner* that detainees engaged in the hunger strike should be allowed to use the old vans for transport to Camps Echo or Delta.

At the outset, the Court must applaud the JDG's effort to accommodate detainees request for new vans with better air conditioning and its ongoing effort to modify those vans to allow detainees to sit upright during transport.  Bogdan Decl. ¶ 22.  Thus, the Court hopes any accommodation it requires in this regard will be short lived.  Applying the first *Turner* factor, as between the old vans and the unmodified new vans, no penological interest favors the use of one

over the other.  The government admits that the old vans are still available for use use and that it purchased the new vans as part of a "routine fleet upgrade and to address detainee complaints about a lack of air conditioning in the older vans."  Opp'n 10.  The government's decision to replace the vans does not implicate its penological interest in security or orderly operations. Nothing, for example, suggests the old vans are any less secure than the new vans.   Applying the remaining *Turner* factors, the Court finds that accommodating the detainees' request here would be truly costless.  Indeed, given that the old vans are still available and just as good, the cost to the JDG to use one of the old vans rather than one of the unmodified new vans is zero.  The government tacitly admits this insofar as it allows detainees with certain medical conditions to use the old vans while the new vans are being modified.  Bogdan Decl. ¶ 22.  Detainees participating in the hunger strike should be accommodated similarly.  Indeed, given the importance of the right to habeas corpus and access to counsel for the detainees, wisdom counsels in favor of granting a truly costless request like the one petitioners have submitted here.

## VI.    CONCLUSION

In closing his speech at the National Defense University, the President quoted Judge William Young.  *See* Remarks by the President at the National Defense University.   In sentencing Richard Reid, the shoe bomber, Judge Young told him that "[t]he way we treat you . . . is the measure of our own liberties."  *Id.*  Judge Young's comment is equally apt when applied to the detainees at Guantanamo.

This Court is duty bound to protect the writ of habeas corpus as a fundamental prerequisite of liberty by ensuring that all those who seek it have meaningful and effective access to the courts.  For Guantanamo detainees, it is undisputed that access to the courts means nothing without access to counsel.  The JDG's behavior, exemplified by the new search and meeting

procedures, flagrantly disregards the need for a light touch on religious and cultural matters that Admiral Walsh recognized years ago.  Further, the search procedures discourage meetings with counsel and so stand in stark contrast to the President's insistence on judicial review for every detainee.  The Court, whose duty it is to call the jailer to account, will not countenance the jailer's interference with detainees' access to counsel.

For the foregoing reasons, the Court finds the challenged procedures and regulations invalid as they pertain to counsel access.  The Court further concludes, pursuant to ¶ I.E.34 of the Protective Order, that this Memorandum Opinion and the accompanying Order issued this date should not be designated as protected, but will be available on the public record.  Given the limits of this Court's jurisdiction, the Court's holding does not affect the ability of the JDG to continue to administer the Guantanamo detention facility as it finds appropriate with respect to issues unrelated to counsel access.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on July 11, 2013.

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

_____
                                        )
IN RE GUANTANAMO BAY                    )      Misc. No. 1:12-mc-398 (RCL)
DETAINEE LITIGATION                     )
_____ )
                                        )
SAEED MOHAMMED SALEH HATIM,             )
et al.,                                 )
                                        )
                    Petitioners,        )
            v.                          )      Civil No. 1:05-cv-1429 (RCL)
                                        )
BARACK H. OBAMA, et al.,                )
                                        )
                    Respondents.        )
_____ )
                                        )
FADHEL HUSSEIN SALEH HENTIF,            )
et al.,                                 )
                                        )
                    Petitioners,        )
                                        )
            v.                          )      Civil No. 1:06-cv-1766 (UNA)
                                        )
BARACK H. OBAMA, et al.,                )
                                        )
                    Respondents.        )
_____ )
                                        )
ABDURRAHMAN ABDALLAH ALI                )
MAHMOUD AL SHUBATI, et al.,             )
                                        )
                    Petitioners,        )
                                        )
            v.                          )      Civil No. 1:07-cv-2338 (UNA)
                                        )
BARACK H. OBAMA, et al.,                )
                                        )
                    Respondents.        )
_____ )

**RESPONDENTS' MOTION FOR A STAY PENDING POSSIBLE APPEAL
AND REQUEST FOR AN ADMINISTRATIVE STAY
EXHIBIT 1: DECLARATION OF GENERAL JOHN F. KELLY, USMC**

<u>DECLARATION OF GENERAL JOHN F. KELLY</u>

I, General John F. Kelly, declare as follows:

1. I am the Commander of United States Southern Command (USSOUTHCOM). USSOUTHCOM is one of nine unified Combatant Commands in the Department of Defense. USSOUTHCOM is a joint military command supporting U.S. national security objectives throughout the Western Hemisphere in cooperation with domestic and international partners, in order to foster security, ensure stability, and promote prosperity throughout Central and South America, the Caribbean, and the global community. USSOUTHCOM is responsible for providing contingency planning, operations and security cooperation for Central America, South America and the Caribbean (except U.S. commonwealths, territories and possessions). The command oversees the force protection of U.S. military resources at these locations. USSOUTHCOM is also responsible for ensuring the defense of the Panama Canal and canal area. As the Commander of USSOUTHCOM, my area of responsibility encompasses 31 countries and 15 areas of special sovereignty. The region represents about one-sixth of the landmass of the world assigned to regional unified commands. USSOUTHCOM is a joint command comprised of more than 1,200 military and civilian personnel representing the Army, Navy, Air Force, Marine Corps, Coast Guard, and several other federal agencies. The military departments provide USSOUTHCOM with component commands that, along with our Joint Special Operations component, two Joint Task Forces (including Joint Task Force-Guantanamo Bay), one Joint Interagency Task Force, and Security Assistance offices, perform USSOUTHCOM missions and security cooperation activities.

2. I enlisted in the Marine Corps in 1970 and served for two years in an infantry company with the 2d Marine Division at Camp Lejeune, NC. I was discharged as a sergeant and subsequently obtained a bachelor's degree from the University of Massachusetts in 1976. After graduating from UMass, I received a commission as an officer in the Marine Corps. I returned to the 2nd Marine Division where I served in turn as a rifle and weapons platoon commander, company executive officer, assistant operations officer, and infantry company commander. During a three year assignment to Marine Corps Headquarters in Washington, D.C., I earned a master's degree from Georgetown University. After numerous other assignments, including multiple deployments to Iraq, I served for 18 months as the Senior Military Assistant to the Secretary of Defense first for Secretary Robert Gates and then for Secretary Leon Panetta. In January of 2012, I was nominated to serve as USSOUTHCOM Commander. On July 26th, 2012, I was confirmed for that position by the Senate. I was promoted to the rank of General and assumed command of SOUTHCOM in November 2012.

3. Joint Task Force-Guantanamo (JTF-GTMO) falls under the operational command of USSOUTHCOM. As the Commander, USSOUTHCOM, I am responsible for all operations conducted by JTF-GTMO and am therefore familiar with JTF-GTMO's policies and procedures that govern these operations. I receive daily operations summaries detailing significant events that have occurred at JTF-GTMO within the past 24 hours. In addition, I receive weekly operations and intelligence briefings that include information on conduct of operations at JTF-GTMO, as well as periodic briefs from the JTF-GTMO Commander. The USSOUTHCOM Operational Planning Team meets weekly to review the policies and

procedures at GTMO, identify issues, and make recommendations to me. I maintain direct contact with my troops and current operations through regular, often monthly, in-person visits to JTF-GTMO.

4.  I am aware of the Court's decision in this case that orders us to modify our current search procedures for detainees as well as the location of attorney visits and the mode of transportation for attorney visits and phone calls. I submit this declaration in support of the Government's motion for a stay of the Court's order pending appeal. The information contained in this declaration is based upon my personal knowledge or information provided to me in the course of my official duties.

The Basis for the Modification of the Search Procedures

5.  In light of the Court's decision, I wish to reiterate the reasons for JTF-GTMO's adoption in April 2013 of the standard Army search (pat-down) procedure in place of the modified procedure that preceded it. As is stated in the Walsh Report, "Review of Department Compliance with President's Executive Order on Detainee Conditions of Confinement", using an SOP that "does not permit searching of the...groin areas, which is contrary to standard security procedures in most detention facility operations...carries a level of risk." While the prior Joint Detention Group (JDG) Commander "accepted that risk out of an elevated respect for religious concerns of the detainees," we discovered that such elevated risk was no longer acceptable in light of the suicide of Adnan Latif and other recent events discussed here.

6.  Shortly before I took command in November 2012, detainee Adnan Latif, ISN 156, committed suicide. My predecessor directed a command investigation under Army Regulation 15-6 to determine the facts and circumstances surrounding the death and steps that could be taken to prevent future detainee suicides. The detailed investigation was conducted by an objective senior officer in the rank of Colonel who was not assigned to JTF-GTMO or to the Joint Detention Group (the detention operations arm of the JTF, hereinafter "JDG"), and involved interviews of 38 persons and the assembly and review of more than 80 documents over the course of approximately 2 months. The investigating officer was also assigned a military judge advocate legal advisor. I reviewed the investigative report in its entirety shortly after taking command.

7.  The investigation found the cause of death for Adnan Latif to be suicide by overdose of paliperidone (Invega). The investigation found that Latif hoarded medications and ingested them shortly before he was found unresponsive. Several factors, to include the prohibition against searching a detainee's groin area contributed to the ability of Latif to hoard the medications. The report found that the prohibition against searching a detainee's groin area created "extraordinary opportunities for detainees to conceal contraband should they choose." The report also included a recommendation that "the JDG Commander revisit the issue of whether to continue to prohibit guards from conducting searches of the area from the waist to above the knee of the detainees." The report goes on to say this "matter relates directly to the opportunities for detainees to hide medications in the area." These findings and recommendations were of particular import and concern to both JTF-GTMO and me

because of the potential for additional deaths if we did not revise the search procedures to address this issue.

8.  In light of the findings and recommendations of the investigation into Latif's suicide, shortly after taking command I directed the JTF-GTMO commander to conduct a review of the standard operating procedures in place at JTF-GTMO, although I understand that such a review was already underway and specifically, that the JDG Commander had already expressed a concern with the prohibition from searching the groin area and noted the risks presented by that policy. The JDG Commander subsequently reported to me that the failure to search the groin area of the detainees, which is otherwise standard procedure in any confinement setting, could result in contraband items being hidden in that area.

9.  Based on the command investigation into Latif's suicide, ongoing concerns about the risk of detainee suicides, and concern for the safety of GTMO personnel and detainees alike if contraband smuggled on detainees' persons, including weapons, could not be effectively detected, the JDG Commander determined that a return to the standard search procedures that permit groin-area searches was appropriate. I was briefed on this issue and concurred that the modified search procedures then in place posed an unacceptable risk to the safety and security of detainees and guards. The JDG Commander, however, initially decided that a phased-in approach would work best in an environment in which the detainee population could be easily provoked because of their frustration about their ongoing detention. The plan was for the changes to be phased in over a period of some months, which would permit time to modify the standard operating procedures, train the guard force and then slowly incorporate the new searches into the procedures. Phase I was to bring consistency of then-existing search procedures through all facilities in JTF-GTMO as the manner and location of the searches had grown inconsistent because 'modified' search procedures have no doctrinal basis in corrections environments. This phase was implemented between November and December of 2012. Phase II introduced a magnetic wand that would be used over the groin area. This was implemented in January of 2013. Phase III introduced the standard frisk procedures, including searches of detainee groin areas, for moves outside a detainee's housing camp or for any contact with non-JTF-GTMO personnel and was anticipated to take the longest to implement. The return to single-cell operations and discovery of large amounts of contraband accelerated implementation of Phase III. A modified search procedure continues to be used for internal movements. A modified search has been deemed sufficient for internal movements because the majority of the contraband seems to be coming from outside the camps and therefore more fulsome searches are needed for external moves; however, implementation of the standard search procedure for all movements—both internal and external—is being contemplated to ensure safety and conform to standard practice in confinement facilities. The phased approach was adopted because it provided detainees an opportunity to adapt and accept the new procedures. As compliance with each phase increased, the next phase was implemented. Historically, most changes to standard operating procedures are implemented in a phased manner in order to allow the detainees to acclimate. Even now, it is my understanding that amount of non-compliance to standard search procedures is decreasing as detainees have grown accustomed to the change.

10. After JTF-GTMO transitioned the detainees from communal living to single-cell living in April 2013, numerous improvised weapons and contraband were discovered in the detainees' cells and common areas, including metal shanks, nails, ball-point pens, and sharpened metal rods, and 12 small MP3 players with audio recording capabilities. Any number of these devices or weapons, or materials that could be used to create such weapons may have been obtained by detainees while outside their residential camps or in meetings with non-JTF personnel and then hidden in their groin areas when returning to their cells to prevent detection. Materials of this nature pose a significant danger to the guard force, to other detainees and, if the detainee desires to commit suicide, to the detainee himself. After being briefed on these issues in April 2013, I fully concurred with the JDG Commander that the adoption of standard search procedures should be expedited, including searches of detainees' groin areas, before and after any movements outside their camps of residence or any meetings with non-JTF personnel. This step was necessary, in my judgment, to reduce the unacceptable risk of detainees smuggling contraband on their persons. Initially, for a very short time, four searches were conducted for each external move; one leaving the detainees' camp, one upon entering Camp Echo, one upon leaving Camp Echo, and one upon re-entering their resident Camp. After approximately 10 days after implementation, this 4-search regimen was deemed unnecessary in light of the threat that the JDG was seeking to combat, namely the introduction of contraband from outside sources. At that time, the number of searches was reduced to two searches, one leaving their resident camp, and one upon conclusion of their external contact (whether attorney meeting, ICRC meeting, or other external movement).

11. To be very clear, at no time during this or any other period during my command was the idea of limiting detainees' access to legal counsel considered or even discussed, and certainly not as a reason for adopting the standard search procedure or any other decision made regarding the secure operation of the detention facilities at Guantanamo. If anyone had made such a suggestion, I would have immediately informed them that such a consideration is inappropriate. Our concern has always been for the safety and security of the detainees, JTF-GTMO personnel, as well as any other personnel on the island (including attorneys visiting the detainees).

Efforts to Facilitate Counsel Access

12. USSOUTHCOM and JTF-GTMO fully support attorney access to detainees and expend significant resources to support detainees' access to counsel. For example, from January 1 through May 31, 2013, JTF-GTMO scheduled over 193 meetings (including morning and afternoon sessions) between detainees and their counsel, and between the months of March and May 2013, JTF-GTMO arranged approximately 100 phone calls between habeas attorneys and their clients (compared to a total of 116 calls throughout all of 2012). Visit requests require 20 days' notice and phone call requests require 15 days' notice in order to plan for the necessary moves and to coordinate attorney visits with numerous other detainee appointments, such as medical and International Committee of the Red Cross (ICRC) visits. Both visits and phone calls are routinely scheduled in accordance with the dates requested by counsel, and it is unusual that JTF-GTMO operational issues require counsel to revise their requested dates to a later time. In addition, requests for both visits and phone calls on an

expedited basis are often considered and granted when appropriate. JTF-GTMO has numerous personnel who assist in the scheduling and execution of all attorney visits and phone calls for both habeas and military commissions, to include six judge advocates, three enlisted legal specialists, five escort teams, and many other personnel who provide security and logistical support at Camp Echo, the attorney meeting location. JTF-GTMO also expends significant resources to provide secure and comfortable meeting locations that are segregated from Camp operations and therefore free from interference.

13. While detainees' lawyers are at Guantanamo, JTF-GTMO provides significant support, including transportation, lodging at modest rates, and logistical support necessary for attorney/detainee meetings to take place. Attorneys traveling to Guantanamo Bay fly to the base on either commercial or military aircraft. Commercial air service is provided by IBC Air, which currently offers round-trip flights between Guantanamo and Ft. Lauderdale, Florida, on Mondays and Fridays. Habeas attorneys also have the option of flying to the base using military aircraft in appropriate circumstances. DoD operates flights that travel to Guantanamo from Andrews Air Force Base, Maryland; Jacksonville, Florida; and Norfolk, Virginia. Because these flights are intended for military personnel on official business, there are limitations on the ability of habeas attorneys to obtain seats on these flights, but the flights are available in appropriate circumstances, and DoD has assisted habeas attorneys in accessing these flights.

14. While it is true that in March 2013 the Department of the Navy temporarily rescinded the landing permit granted to IBC Air, this was the result of non-compliance with Federal regulations. The decision by the Navy was made completely independent of JTF-GTMO operations. Nevertheless, in April 2013, less than one month later, the Navy reconsidered its decision and reinstated IBC's landing authorization through the end of 2013, subject to annual renewal. As Commander, USSOUTHCOM, I strongly advocated in favor of reinstating landing authorization if possible under Federal law and regulations. I was motivated in part by a desire to ensure that detainees' access to counsel was not unduly burdened. In fact, during the period of time between the Navy's March and April decisions, IBC's flights to Guantanamo continued to operate without any interruption. At no point in discussions of this issue did anyone suggest in my presence that the government curtail the availability of flights to prevent the detainees' lawyers from coming to Guantanamo. Just the opposite is true: the need to provide counsel access was one of the reasons flights were reinstated.

<u>Irreparable Harm Associated With Immediate Compliance</u>

15. Requiring JTF-GTMO to attempt to immediately comply with the Court's order regarding search procedures and attorney visit and phone call locations will cause significant disruption to camp operations and will contribute to reduced safety for both guards and detainees.

16. The principal danger posed by complying with the Court's order is the heightened risk that potentially dangerous contraband will be introduced into the camps. Standard search procedures currently in use are necessary and appropriate for all external moves (outside detainees' camps of residence) and external contacts (with non-JTF-GTMO personnel)

because many contraband items found within the camps, such as tempered steel, wires and nails, sometimes can be found on the ground and may possibly be picked up by or given to detainees during external movements, including attorney meetings, medical appointments, family calls, and ICRC interviews. These kinds of items, if obtained by a detainee, can be hidden on his person. Concealing them is made particularly easy if the detainee knows that his groin area cannot be searched. The danger that ensues from these circumstances is two-fold. First, if detainees can smuggle weapons, or weaponizable items into their residential camps, they can be used to attack and injure other detainees, or the guards. Second, if detainees can smuggle such weapons out of the camp, they present a potential threat to external persons with whom detainees may be visiting. In addition, by concealing smuggled contraband in their groin areas, detainees can hoard medication and other items that can be used in suicide attempts. Outside visitors appear to be one of the likely sources of the contraband that JTF-GTMO has discovered, particularly items not normally found in the camps such as electronic devices, food items, and non-issue clothing. Given this likelihood, it is necessary to conduct effective searches of detainees' persons when detainees have external contacts, including those with attorneys and ICRC delegates.

17. Certain types of contraband, such as the dangerous items discussed in the preceding paragraph, may only be discovered through a proper pat down of the groin area. "Shaking the waistband" of a detainee's trousers will not reveal many dangerous contraband items, like nails, shanks, ragged scraps of metal, and, in particular medications that are secreted in the groin area. As a result, returning to the prior, modified search procedure, particularly when detainees will know that their groin areas will not be searched, will increase detainees' ability to hide contraband in their groin areas, as was noted in the Latif death investigation, and correspondingly heighten the attendant risks to JTF-GTMO personnel, visitors, and detainees alike.

18. The serious concern I have with the introduction of contraband such as that noted above is not notional; contraband is found routinely and, indeed, a large stash was recently uncovered in late June 2013. The discovered contraband is shown in the photographs attached as Exhibit A to this declaration. Among these recently seized items are nails, shanks, and a 10-inch T-handled allen wrench. As these photographs illustrate, undiscovered contraband presents a potential threat to guards, attorneys, ICRC personnel, and the detainees alike, every day. Prohibiting the search of the areas between detainees' waists and knees would virtually guarantee them a secure location in which to secret these sorts of items after movements outside the camps. I consider this is an unacceptable risk to the military personnel under my command, as well as the detainees, and civilian visitors, for whose safety and well-being I am responsible.

19. This already unacceptable risk is further heightened by several additional factors. First, the court order specifically requires JTF-GTMO personnel to apply "the modified search procedures identified by Admiral Walsh on page 25" of his report, "Review of Department Compliance with President's Executive Order on Detainee Conditions of Confinement." That report, which was issued in 2009, did not describe the full modified search procedure, so it is not clear exactly what the modified search procedure entails as envisioned by the 2009 Walsh report. Even assuming it is a reference to standing JTF-GTMO procedures as

they remained in place until April 2013, the face of the Court's order does not appear to permit exceptions in situations where JTF-GTMO personnel believe a detainee may have secreted contraband in his groin area. The order states that "guards shall be limited to grasping the waistband of the detainee's trousers and shaking the pants to dislodge any contraband." To prevent personnel from searching the groin area even when they suspect contraband is being hidden in that area heightens the already unacceptable risk to detainees and guards.

20. It should be noted that Military Police are not trained in a "modified" search procedure. They are trained from the outset on the use of standard search procedures. It is unclear when the GTMO-specific 'modified' procedures were instituted, but use of a modified procedure has caused inconsistencies in practice to this day because Soldiers must essentially be trained to ignore their basic training as military policemen. The guard force at JTF-GTMO is rotational. Therefore, every several months, a new unit will arrive that will need to be trained on 'modified' procedures, essentially guarantying some degree of inconsistency.

21. Finally, immediate implementation of the Court's order regarding search procedures will complicate recent efforts to return detainees to communal living based upon their compliance with camp rules. To date, over 30 detainees in Camp 6 have been returned to communal living since the April transition to single-cell living. Communal living is the desire of the overwhelming number of detainees. It is also JTF-GTMO's goal, in the interest of improving the detainees' living conditions, and improving relations with the detainee population generally. This objective cannot be achieved unless the safety and security of both the detainees and JTF personnel can be assured. In addition, if we cannot search detainees' groin areas after movements outside the residential camps and meetings with non-JTF personnel, we have to conduct more frequent full-frisk searches of the entire population to ensure an acceptable level of prison safety. This necessary step will likely result in strong resistance from the detainees, leading to disciplinary problems, and thereby jeopardize their return to communal living status.

22. In addition to imposing the modified search procedure, the Court's order requires JTF-GTMO to permit attorney visits in two rooms located in Camp 6 that were used occasionally for attorney visits prior to September 2012 and one room located in Camp 5 that was identified in Admiral Walsh's report as being used at that time, some four years ago, for attorney visits. The Court's order requires that attorney visits take place in these housing camps "for any detainee (1) who is in a weakened physical state on account of participation in a hunger strike or (2) who has any medical condition that makes travel outside the housing camp difficult." This creates numerous operational problems.

23. While I am not aware of the precise circumstances under which the room in Camp 5 referenced in the Court's order was used in 2009, that room was never intended for or designed for attorney-client meetings, and no other room is available in Camp 5 that would be appropriate for such meetings. This one room is very small, approximately 4 feet by 6 feet, but is not soundproofed and has no visual monitoring capability. Even with the door closed, conversations are clearly audible outside. To permit the visual monitoring of

meetings that is necessary for safety and security reasons, guards would have to be stationed immediately outside the room, near enough to maintain visual contact in order to conduct proper monitoring and ensure an appropriate response time in case of an incident, thereby increasing the possibility that confidential conversations in the room could be overheard,. Further, moving the guards out of earshot, which could be upwards of 15 feet away, means the guard can no longer maintain visual contact, creating a significant safety and security risk. To repurpose the room appropriately for attorney visits will require significant time and resources, and it would be a difficult undertaking to obtain effective modifications considering the size of the room and its location within an operational area of the Camp, such that operational traffic would occur outside the room, absent changes to Camp operations.

24. With respect to the rooms in Camp 6 that could be used for attorney meetings, Colonel Bogdan's prior declaration in this matter describes the operational problems that would be created by regular use of the rooms for attorney meetings.

25. While the Court's order assumes that meetings within the Camps will have minimal impact on manpower resourcing, this is not the case. As explained above and in Colonel Bogdan's prior declaration in this matter, holding attorney visits in Camps 5 and 6 will require the use of multiple guards in each camp to monitor, visually, such visits as they occur. This responsibility will add to the existing burdens on a guard force already fully utilized to meet the demands placed on JTF-GTMO by other operations, including medical appointments, other legal visits or calls, military commission hearings, ICRC meetings, family calls, and other matters necessary for the orderly and appropriate functioning of JTF-GTMO. Further, I am aware of the daily stress otherwise endured by the guard force. Detainees routinely taunt guards with racial epithets and sexually-offensive comments, "splash" them with feces, urine, and other bodily fluids, and physically assault them when they can. The JTF-GTMO guard force, which is perhaps the most scrutinized guard force in the world, must be ever vigilant and must also carry themselves with the utmost restraint and professionalism. Accordingly, adding to the burdens already placed on the guard force must be carefully considered to ensure that the guard force is not stretched to the point, both individually and collectively, that it cannot effectively carry out its responsibilities. The effect of the Court's order will be that duties that would otherwise be carried out by guards covering what could become routine attorney visits within Camps 5 and 6 will need to be performed by those same guards, increasing the number of duties imposed on those guards, or, more likely, will need to be reassigned to others within the guard force for the camp or from other areas of JTF-GTMO, possibly including personnel not currently on guard duty. While personnel can be reassigned to cover such duties or the monitoring of attorney visits, this will have secondary "ripple" effects throughout JTF-GTMO. The duties from which such personnel will be drawn will necessarily be assigned to other Soldiers. Any of these scenarios will place additional significant burdens on JTF-GTMO; burdens that would not exist if attorney meetings were held at Camp Echo, which already has a dedicated guard force for handling visits by attorneys and others.

26. Furthermore, it is unclear how the "weakened detainee" standard in the Court's order for determining when a detainee is entitled to visit counsel in his housing camp is to be applied and who is responsible for making the determination as to whether a detainee does or does

not meet that standard. JTF-GTMO medical personnel report that currently there are no detainees in Camps 5 or 6 who cannot be safely transported to the attorney meeting rooms at Camp Echo.

27. The current vans that transport the detainees were purchased in order to improve their comfort. Specifically, the detainees complained that it was too hot in the rear of vehicle. In order to resolve this problem, new vans were purchased with larger air conditioning ducts that significantly improved airflow. As Colonel Bogdan noted, the vendor did not account for the lower ceiling when they installed the benches. This reduced headroom slightly. This error was quickly identified by JTF-GTMO and the JTF has been actively working to retrofit the vans with lower benches in order to make the vans more comfortable. Of the five new vans that were purchased, one has been retrofitted, one is currently being fixed and should be ready within the next two weeks, and the remainder will be retrofitted in turn. In addition, JTF-GTMO has one older van still active in the fleet that is used when professional medical personnel determine that use of a van with greater head clearance is required. With regard to detainee rides within the vans, the travel distance between Camps 5 and 6 and Camp Echo is approximately 400 yards and requires approximately 10 minutes inside the van. Finally, JTF guard-escorts must ride in the same van with the detainee and are subject to the same conditions. It should also be noted that JTF-GTMO schedules countless moves that occur daily up to a week in advance. To leave the decision of which van to use at the discretion of the detainee will make the process of schedule moves simply unmanageable as last minute detainee decisions will have a cascading effect on the resources available for other detainee moves that must be rescheduled, and in some cases cancelled, in order to accommodate the request, to include other counsel calls and medical appointments.

28. I am aware that the Court's opinion included significant and substantive information from Colonel Bogdan's declaration regarding the current search procedures in place at GTMO. It is my understanding those details regarding how the searches are conducted was provided to the Court under seal and designated as protected. The release of that information publically will require us to review the current procedures and determine whether any modifications need to be made to address the fact that the general public and the detainee population now know the specifics of how we conduct our searches at the facility. Providing that information to detainees could lead to effort on their part to create methods of evading detection of secreted contraband items during a search.

I swear under penalty of perjury that the foregoing is true and correct.

General John F. Kelly

July 16, 2013

Date

# EXHIBIT A





# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| | ) | |
| IN RE GUANTANAMO BAY | ) | Misc. No. 1:12-mc-398 (RCL) |
| BAY DETAINEE LITIGATION | ) | |
| | ) | |

_____

|  |  |  |
|---|---|---|
| | ) | |
| SAEED MOHAMMED SALEH HATIM, | ) | |
| et al., | ) | |
| | ) | |
| Petitioners, | ) | |
| v. | ) | Civil No. 1:05-cv-1429 (RCL) |
| | ) | |
| BARACK H. OBAMA, et al., | ) | |
| | ) | |
| Respondents. | ) | |

_____

|  |  |  |
|---|---|---|
| | ) | |
| FADHEL HUSSEIN SALEH HENTIF, | ) | |
| et al., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil No. 1:06-cv-1766 (UNA) |
| | ) | |
| BARACK H. OBAMA, et al., | ) | |
| | ) | |
| Respondents. | ) | |

_____

|  |  |  |
|---|---|---|
| | ) | |
| ABDURRAHMAN ABDALLAH ALI | ) | |
| MAHMOUD AL SHUBATI, et al., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil No. 1:07-cv-2338 (UNA) |
| | ) | |
| BARACK H. OBAMA, et al., | ) | |
| | ) | |
| Respondents. | ) | |

_____

**RESPONDENTS' MOTION FOR A STAY PENDING POSSIBLE APPEAL
AND REQUEST FOR AN ADMINISTRATIVE STAY
EXHIBIT 2: AL-MITHALI CALL REQUEST**

## Request for Privileged Telephone Call on
## Secure (Classified) or Unsecure (Unclassified) Line

SUBMITTING COUNSEL Rushmi Bhaskaran _____ DETAINEE ISN 840 _____

FIRM Debevoise & Plimpton LLP _____ DATE SUBMITTED 7 / 2 / 2013

DATE REQUESTED FOR CALL 7 / 17 / 2013   TYPE OF CALL REQUESTED: SECURE / UNSECURE

TIME AND DURATION REQUESTED 90 minutes; 9:00 a.m EST _____ (CALL MUST BE DURING
STANDARD COUNSEL VISITING HOURS MONDAY-FRIDAY. DURATION IS LIMITED TO 90 MINUTES.)

PARTICIPANTS IN CALL AND TELEPHONE NUMBERS (INCLUDING TRANSLATOR):

| Attorneys (NY) ( | Jennifer Cowan; Rushmi Bhaskaran; Michael Leigh |
| Attorneys (DC) ( | Nicole Stankewicz |
| Translator ( | |

COUNSEL E-MAIL ADDRESS AND PHONE NUMBER: ▇▇▇▇▇▇▇▇▇▇▇▇

DATE OF COUNSEL, CO-COUNSEL, OR FIRM'S NEXT REQUESTED VISIT TO GUANTANAMO: None _____

### CERTIFICATIONS

EXPLANATION FOR WHY THIS CALL IS NECESSARY TO PREVENT PREJUDICE TO DETAINEE-PETITIONER:
We request a call on July 17, 2013 to assess our client's health condition, which has deteriorated significantly over the past several months.
Prejudice to our client's health may result if this request is not granted.
We do not have a visit scheduled in the coming months and the delay inherent in written correspondence will prejudice our client's
ability to timely provide critical information to his counsel.

_____
_____
_____
_____
_____
_____

• Requests to conduct a secure/unsecure telephone call will not be granted absent a showing that the telephone call is necessary at the requested time in order to prevent prejudice to the detainee-petitioner. Counsel shall provide specific information (including any upcoming litigation deadlines) explaining why the request is necessary. Counsel shall also include an explanation why the detainee-petitioner would be prejudiced by waiting to speak with counsel until counsel's next visit or communicating through written correspondence.

• Counsel's oral communications with the detainee-petitioner shall be governed by the appropriate protective order entered in the detainee-petitioner's habeas case. See e.g., Procedures For Counsel Access To Detainees At The United States Naval base In Guantanamo Bay, Cuba ¶ 12.G (prohibiting certain oral communications).

### Request for Privileged Telephone Call on Secure (Classified)/Unsecure Line

IF APPLICABLE, EXPLANATION FOR WHY THIS CALL MAY TAKE PLACE ON AN UNCLASSIFIED TELEPHONE LINE:

We certify that we will not discuss classified information during this call, and that we have no reason to believe that classified information will be discussed.

_____
_____
_____
_____
_____
_____
_____

- In the event counsel certifies that counsel will not discuss classified information during the telephone call and further certifies that counsel has no reason to believe that classified information will be discussed during the telephone call, in appropriate circumstances, DoD and JTF-GTMO may permit the telephone call to occur over a non-secure telephone line. Any such calls will be subject to monitoring by the DoD Privilege Team to ensure that no classified information is discussed.

- DoD and JTF-GTMO reserve the right to cancel or modify the time/date of a secure/unsecure phone call for any reason, including for operational reasons, security reasons, conflicting or emergency requests for secure/unsecure telephone calls from other counsel, and court-imposed obligations. It is the position of DoD and JTF-GTMO that neither the existence of the secure/unsecure call process nor the scheduling of a secure/unsecure call creates any enforceable right or benefit for or in favor of counsel, detainee, or any other person.

- To request a secure/unsecure telephone call, submit this request form to ███████████████████ and ███████████████████████████ through the same process as followed for counsel visit requests. Requests will be considered on a case-by-case basis due to special circumstances. To allow for arrangement of necessary logistics at Guantanamo Bay and at the secure/unsecure facility, requests must be submitted at least 15 days in advance of the requested date. Requests for telephone calls submitted inside of 15 days (including requests to modify a previously-approved phone call date) will not be considered absent extraordinary circumstances. Counsel will be notified whether the request has been approved and/or whether JTF-GTMO can accommodate the request at an alternative time/date.

Acknowledged:

7/2/13

Date         Signature of Counsel